[No. B057029. Second Dist., Div. Five. Jan. 27, 1994.]

DON H. HAYCOCK, Plaintiff and Appellant, v.
HUGHES AIRCRAFT COMPANY et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. Parts I, II, the heading for part III, the indicated portions of part III(B), and part V are to be published.

1474

**COUNSEL**

Don H. Haycock, in pro. per., for Plaintiff and Appellant.

Gartner & Young, Lawrence J. Gartner, Greines, Martin, Stein & Richland, Kent L. Richland, Feris M. Greenberger and Alison M. Turner for Defendants and Appellants.

## OPINION

### TURNER, P. J.—

## I. INTRODUCTION

Don H. Haycock (plaintiff) alleged he was constructively discharged from his employment with Hughes Aircraft Company (defendant) after more than 25 years with the company. The case was tried before a jury, which found in plaintiff's favor. Defendant appeals contending: (1) it was error to deny defendant's motion for judgment notwithstanding the verdict because there was insufficient evidence of a constructive discharge and damages; (2) the trial court improperly usurped the jury's function in deciding, as a matter of law, an implied employment contract existed; (3) it was prejudicial error to give BAJI No. 10.02 on constructive discharge; and (4) it was prejudicial error to admit into evidence certain memoranda written by plaintiff without giving a limiting instruction. Plaintiff cross-appeals and argues it was error to grant a judgment of nonsuit as to plaintiff's causes of action for termination in violation of public policy and defamation. In the published portion of this opinion, we address whether the legal issue of whether plaintiff was an "at-will" employee must have been submitted to the jury. We find it was error to decline, over defendant's objection, to present the question of whether there was an implied contractual covenant not to terminate but for good cause and to grant a judgment of nonsuit as to plaintiff's defamation claim; remand for a limited retrial on these two issues; but otherwise affirm the judgment.

## II. THE EVIDENCE

At the time he retired, plaintiff was employed in defendant's Systems Engineering Lab (SEL), a part of the Electro-Optical and Data Systems Group (EDSG), in division 71. Plaintiff contended, and the jury found, he was forced to retire because of "intolerable conditions." Viewed in the light most favorable to the judgment (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1087 [4 Cal.Rptr.2d 874, 824 P.2d 680]), the evidence showed plaintiff was forced to resign after he was given no choice but to continue working under a supervisor, Jack Rafelson. Mr. Rafelson had possession and control of plaintiff's personnel file. There was substantial evidence that without plaintiff's knowledge, Mr. Rafelson had been: making unwarranted changes and false entries in plaintiff's personnel file which reflected negatively on him; removing from that file documents and information favorable to plaintiff; and improperly adding to that file documents which were unreasonably and inaccurately critical of plaintiff. The evidence also showed: plaintiff had complained of these actions to successively higher

levels of corporate management; he had not been afforded a complete and satisfactory investigation and resolution of his complaints; his efforts to secure correction of the inaccuracies in the personnel file which contained false entries were unsuccessful; his request to be reassigned to work under a different supervisor was to no avail; and, notwithstanding the fact defendant's employees concluded Mr. Rafelson had made improper entries in the file, it was returned to his custody and control. It was also shown documents had been prepared in anticipation of laying plaintiff off in a manner which contravened corporate policy. Plaintiff was to be advised the layoff was due to declining business[1] while other documents reflected a "for cause" termination which avoided the special protections due plaintiff because of his seniority with the company. A termination "for cause" would have a devastating impact on plaintiff's chances for reemployment in another division of defendant or with other companies. There was substantial evidence this situation went on for over a year. Compounding defendant's problems on appeal, its employees often contradicted one another testifying concerning the events occurring prior to plaintiff's early retirement. We begin by summarizing the substantial documentary and testimonial evidence in this case.

### A. Defendant's Policies and Procedures

#### 1. The performance appraisal system

Defendant's policy required that every employee receive a performance appraisal at least annually. A performance appraisal form was used and the process required the employee's participation. According to a "supervisor's reference handbook" entitled "Managing the Performance Planning and Appraisal System," the following steps were to be taken: (1) "Ongoing performance planning and communication with employee"; (2) "Supervisor explains form to employee"; (3) "Employee completes first page by assigned date"; (4) "Supervisor comments and assigns preliminary rating"; (5) "Supervisor reviews comments and rating with manager"; (6) "Supervisor receives approval of rating from major organization"; (7) "Supervisor schedules performance planning and appraisal session with employee"; (8) "Performance planning and appraisal interview: [¶] Discuss rating[,] [¶] Review performance summary[,] [¶] Develop supervisor/employee action plan"; (9) "Review with manager and obtain signature"; (10) Copy of completed form to employee"; (11) "Original of completed form to department file"; and (12) "Progress meetings on objectives as appropriate."

Richard E. Battle, the director of human resources for EDSG, testified the employee's supervisor "is supposed to have a discussion with [her or his]

---

[1]It was undisputed that at all relevant times defendant's business was declining and its workforce was being substantially reduced through retirement, attrition, and layoff.

immediate supervis[or] about [her or his] assessment of the overall rating of the employee, and that should take place before there is any sit-down discussions with the employee to make sure there are no differences of opinion." The performance appraisal system: resulted in work planning for the upcoming year; identified areas in which the employee needed to improve; and identified superior aspects of the employee's performance. The employee was to be assigned a rating on a scale from one to five. One was the highest rating. As described by Mr. Battle, "a [three is] considered to be essentially fully satisfactory performance, and ratings above that being at higher levels, obviously, and ratings below that being from marginal to unsatisfactory performance." Five percent of employees were rated one; 5 percent were rated five; 15 percent were rated two; another 15 percent were rated four; and the remaining 60 percent were rated three. Both the supervisor and the employee were to sign the performance appraisal form. It was then placed in the employee's department personnel file. Mr. Battle testified that if a performance rating was to be changed, "Normally, the employee is to be advised of that change and the reasons for that change and asked to re-sign the document and date it." The supervisor's reference handbook on this subject stated: "If there are any changes in the appraisal form after review by your immediate manager, be sure to go back to the employee and explain the revisions. Obtain the necessary signature." It also stated: "The employee is entitled to a copy of the appraisal form for his or her own records. No changes can be made on the original form without giving a new copy to the employee."

## 2. *The problem resolution procedure*

Mr. Battle described defendant's "Employee Problem Resolution Procedure" as follows: "It provides for a problem resolution procedure for all employees [who, like plaintiff, are] not represented by a bargaining unit. . . . [¶] The procedure provides for a mechanism by which employees can air grievances or complaints or feelings of wrongdoing with their supervisor, or if they do not feel that supervisor is the appropriate channel they wish to pursue, directly with Human Resources, and it provides a mechanism and several steps which are followed progressively higher generally for ultimate resolution of that complaint." If an employee was dissatisfied with results at the group or local level, she or he could raise the complaint for consideration at the corporate level.

## 3. *The layoff policy*

Defendant's Human Resources Practice No. 3-0-22 governed layoffs of employees. The general policy was as follows: "When layoffs become

necessary due to lack of work or funds, it is the practice of the Company to identify which job classifications will be affected, and to give recognition to performance, skills, and length of Company service in determining which employees in each work group will be laid off, retained, or transferred. When performance and skills are relatively equal, those employees within the work group having the longest Company service are retained or transferred. Supervision should attempt to locate alternative employment within the Division, Group, or other Company organizations." Special consideration was given to "long service" employees as follows: "The layoff of any salaried employee with 12 or more years of continuous service must be approved by the employee's Department and Division Manager, and Group President/Corporate Executive." Human Resources Practice No. 3-0-22 also provided: "Layoffs shall be utilized only when there is a lack of work or funds. Unsatisfactory employees should be discharged for cause, after following appropriate disciplinary procedures, rather than being placed on layoff."

Yvonne Ellis, a junior employee relations representative assigned to division 71, of which SEL was a part, testified regarding the layoff procedure. To begin with, the department must identify the job classification to be affected. Then, the individuals in that classification to be considered for layoff must be identified. Human resources monitored the procedure to ensure that "the proper person would be selected for layoff." Ms. Ellis also testified that when an employee was going to be laid off and a layoff approval form was prepared, the employee had a right to see that document.

Priscilla Carver, the personnel administrator for SEL, testified a layoff was not the same as a " 'termination for cause.' " To terminate an employee for cause required "documentation" and a reason for the termination. Ms. Carver stated: "It can be poor performance, but it has to have more than that . . . the history has to show if they . . . had a decline or how it is."[2]

4. *Evidence plaintiff was an at-will employee*

No document received in evidence nor any one of defendant's employees testified plaintiff was an at-will employee.

---

[2]It was undisputed that in late 1986 all of the employees in Mr. Rafelson's organization, including plaintiff, were being considered for layoff because of declining business. Instead, Mr. Rafelson arranged the transfer of his entire organization out of SEL and into the Products Analysis Lab (PAL) under Gerald Morrison in March 1987.

## B. *Background*

### 1. *Plaintiff's employment history with defendant*

Plaintiff was first employed by defendant in 1961. He joined SEL in 1974. He took a one-year leave of absence from defendant in 1975 to practice patent law. He returned to defendant in May 1976 with the expectation he would be laid off after six days and would collect $8,500 in severance pay with which to build his law practice. However, he was not laid off. His law practice was formally disbanded in 1977, but he continued to handle cases until 1984. In 1986, plaintiff worked briefly on the "Bradley program" under Jeffrey McConnell. He was fired by another supervisor after four to six weeks.[3] As of April 1986, plaintiff was working for Mr. Rafelson in SEL; he was functioning "quite a ways" below his job classification level, but with no reduction in pay. Mr. Rafelson's entire organization within SEL, including plaintiff, transferred to the PAL under Mr. Morrison in March 1987. Plaintiff was on sick leave in January, February, and March 1987, and again in July, August, September, and October 1987.[4] He was on vacation leave in October and November 1987. Plaintiff retired from defendant effective December 1, 1987.

In the 25 years plaintiff worked for defendant he was never passed over for salary increases, until January 1987. In addition, plaintiff had received performance appraisal ratings of two "over a period of time." It was undisputed plaintiff had never been the subject of any disciplinary proceedings.

### 2. *The December 1986 performance appraisal*

On December 17, 1986, plaintiff met with his supervisor, Mr. Rafelson, concerning his performance appraisal for the period from January 1986 to October 1986. Mr. Rafelson assigned plaintiff an overall rating of three. Plaintiff and Mr. Rafelson agreed a comment that plaintiff " '[n]eeds to overcome management perception of poor people manager' " would be deleted from the appraisal.[5] Plaintiff and Mr. Rafelson then signed the appraisal.

The appraisal was reviewed by Mr. Rafelson's superior, Mr. McConnell, in January 1987. Mr. McConnell determined plaintiff should be "passed"; in

---

[3]Plaintiff testified he was fired because he pulled "a young analytical engineer" off another project. According to plaintiff, the services of the engineer had been promised to him.

[4]Plaintiff was out with a virus from January through March 1987, suffered a detached retina in July 1987 causing him to be unable to work into October 1987, and took vacation leave from October through November 1987.

[5]Mr. Rafelson testified the comment was deleted because plaintiff "took exception to the remark." Plaintiff testified the comment was deleted because the perception was unjustified and was partly due to Mr. Rafelson's failure to advise management of certain facts.

other words, he should not receive a merit salary increase. Mr. McConnell testified he was advised by the head of administrative controls for the division, Kathleen Patricia Kamiya, that it was a "Division requirement" that an employee rated a three could not be passed for a merit salary increase; the rating had to be a four or below. In pretrial deposition testimony Mr. McConnell stated: " '. . . So I said that we . . . were intent upon the salary review in the past, and that if it was necessary to change the rating from a 3 to a 4, that was the action that we wanted to take. [¶] She told me that in order to do it this late, which is in the last few weeks of January, it had to be documented to Division management, the reason for the change in rating. [¶] So she told me to prepare an AVO [avoid verbal orders memorandum] to her with a rationale for the change in the review and to make the appropriate changes on the personnel form.' "

Ms. Kamiya's testimony was in conflict with that of Mr. McConnell on the subject of the rating needed to avoid a pay increase. Ms. Kamiya denied there was any department policy or practice which required that an employee receiving a rating of three be given a merit salary increase. She testified an employee with a three rating could be "passed." She also testified department managers were not required to provide justification for "pass[ing]" an employee. Further, it was not a division policy that to change an employee's performance rating required an "AVO" to the division and appropriate follow-up changes in the employee's personnel file.

Within five minutes of the telephone conversation with Ms. Kamiya, on January 23, 1987, Mr. McConnell prepared an AVO which stated: "This performance appraisal was prepared in November, discussed with the employee in mid December, and submitted for organizational review in early January. [¶] It has *failed* organizational review because of additional information about his performance in the *4th* quarter of 1986 which came to our attention in early January. [¶] Don Haycock is not an asset to SEL. He does not perform at level IV. He cannot get along with other people. He is not a team player. No one wants him to work on their programs. [¶] He is now a candidate for layoff. An updated performance appraisal is in process at this time. [¶] This employee should be passed." Mr. McConnell sent the AVO to Ms. Kamiya. He did not show this memorandum to plaintiff. He did not have any conversations with anyone in "Human Resources" about what he was doing. Nor did he tell any staff member of the "Human Resources" about his actions.

Mr. McConnell wrote the word "rejected" on plaintiff's performance appraisal form, signed the document, and dated it January 16, 1987. He testified he did not put the rejected appraisal in plaintiff's personnel file.

Further, he did not tell anyone to put it in the file. He sent the rejected performance appraisal back to Mr. Rafelson with instructions to prepare a new appraisal, discuss it with plaintiff, and complete the rating process. Mr. McConnell's superior, David Goran, concurred in changing plaintiff's rating to a four. Mr. McConnell testified he found himself a new job, "left the organization" after January 1987, and had no further contact with plaintiff.

The "additional information" about plaintiff referred to in Mr. McConnell's AVO of January 23, 1987, related to plaintiff's work on the "C-NITE" project.[6] The evidence at trial was in conflict on the question whether plaintiff's performance on that project was satisfactory.[7]

---

[6]At his pretrial deposition, Mr. McConnell was asked about the reference to "additional information" about plaintiff in his AVO of January 23, 1987. Mr. McConnell then testified he did not recall "what that was." He further stated, " 'I don't recall anything about the additional information, who the source was or what the information was.' " This was in direct conflict with Mr. McConnell's trial testimony. At his deposition, he did not recall having had any discussion with Jack Shafer regarding plaintiff's performance on the C-NITE project. He only vaguely recalled a conversation with Otha Stubblefield regarding the plaintiff's performance. At trial, however, Mr. McConnell changed his testimony and testified he had received information concerning plaintiff's participation in the C-NITE project from Mr. Shafer and Mr. Stubblefield. The information was consistent with his own opinion, based on his own observations of plaintiff. Specifically, Mr. McConnell stated: "In early January, it came to my attention that you were no longer in that [C-NITE] assignment, that the work was not completed, and it was not completed to the satisfaction of the project people in the C-NITE program." Mr. McConnell said he had talked to Otha Stubblefield and Jack Shafer "as well to some extent." When asked what he meant by the statement plaintiff could not "get along with other people," Mr. McConnell stated he had "some direct observations to that effect" and "there were a number of instances where people expressed concern about reporting to you." However, he could not testify who those people were, nor could he recall whom he talked to that led him to make that statement. He could not recall whom, if anyone, he had talked to with regard to the statements that plaintiff was "not a team player" and "no one wants him to work on their programs."

[7]Mr. McConnell testified at trial he received information in early January that C-NITE test reports for which plaintiff was responsible had not been completed to the satisfaction of the project leaders. This was consistent with his own observations of plaintiff. However, as noted previously, this was inconsistent with his deposition testimony. The C-NITE project manager, Otha Stubblefield, testified he was dissatisfied with plaintiff's performance on the project. The C-NITE flight test director, Mr. Shafer, likewise testified he was dissatisfied with plaintiff's performance. He also stated he had conveyed this information to Mr. McConnell. However, there was evidence preliminary test reports had been delivered to the customer in a timely manner in December 1986 and the customer had been happy with them. Mr. Shafer did not tell Mr. McConnell the reports had gone out in December. Plaintiff admitted he had "heated arguments" with Mr. Stubblefield in connection with the C-NITE project. Plaintiff testified he had resented Mr. Shafer's input on the reports. This was because Mr. Shafer was not following applicable standards. Plaintiff presented evidence his attempts to retrieve data necessary for the reports had been frustrated, yet he had timely produced the preliminary test reports. He testified he had intended to timely produce the final reports in January 1987, but was taken off the project. Victor R. Garcia, who worked for plaintiff in 1986, testified

Mr. Rafelson prepared a revised performance appraisal for plaintiff on January 27, 1987, assigning him an overall rating of four. It was prepared at Mr. McConnell's request. It was not shown to nor signed by plaintiff, a violation of defendant's written policies. Mr. Rafelson testified he did not know why he did not obtain plaintiff's signature on it. Sometime thereafter, Mr. Rafelson prepared a layoff approval request with respect to plaintiff. The layoff approval request is discussed further below.

### 3. *The March 1987 merit review*

Plaintiff had a merit review meeting with Mr. Rafelson in March 1987. Plaintiff was told his performance rating had been reduced to four and he was being passed over for a merit salary increase. Plaintiff testified Mr. Rafelson also told him "termination proceedings had been brought against [him]" under pressure from Mr. McConnell, Mr. Goran, and Mr. Brill as a result of complaints about plaintiff's work on the "C-NITE" project. Mr. Rafelson denied telling plaintiff this. Plaintiff reviewed his personnel file in Mr. Rafelson's presence and discovered that certain favorable performance appraisals had been removed from his file; the performance rating of two on plaintiff's August 1986 performance appraisal had been "changed by white-out" and replaced with a three; Mr. McConnell's AVO of January 23, 1987, had been placed in plaintiff's file; and plaintiff's original annual performance appraisal for 1986 marked "rejected" had been placed in his file.

### 4. *Investigation and "resolution" of plaintiff's complaints*

Plaintiff discovered the revised August 1986 performance appraisal, Mr. McConnell's AVO of January 23, 1987, and the other problems with his personnel file. Plaintiff testified he then immediately met with Mr. McConnell. During the meeting, Mr. McConnell said the decision to reduce his performance rating for 1986 had been the joint decision of himself and his superiors. Mr. McConnell testified he could recall no further contact with plaintiff following their January 1987 meeting.

Plaintiff also met with Mr. Battle, the director of human resources for EDSG, and Harland Celestine, a human resources manager, in March 1987. Mr. Battle directed Mr. Celestine to take charge and to investigate plaintiff's complaints. Mr. Battle testified he had no further involvement in "the resolution process." Mr. Celestine, in turn, assigned the investigation of plaintiff's complaints to Ms. Ellis, the employee relations representative for plaintiff's division. He directed her to meet with plaintiff to determine what his complaints were and to investigate them.

plaintiff was well-liked, amiable, and friendly. Mr. Garcia also testified he had never observed plaintiff to be abrasive toward anyone.

Plaintiff met with Ms. Ellis on April 14, 1987. Ms. Ellis testified plaintiff wanted the following action taken: change his annual performance rating for 1986 back to a three; secure a merit salary increase; remove Mr. McConnell's AVO of January 23, 1987, from his personnel file; remove the 1986 annual performance appraisal marked "rejected" from his personnel file; and obtain a performance appraisal from Frank Damon, under whom plaintiff had worked on the C-NITE project. Ms. Ellis testified she accomplished all of these requests, with the exception of obtaining an evaluation from Mr. Damon,[8] under authorization from Mr. Brill. In other words, Ms. Ellis took steps to contravene the actions of defendant's supervisors. She stated plaintiff's complaints were resolved in his favor because Mr. McConnell had not followed company guidelines. As of May 1987, Ms. Ellis considered plaintiff's complaints resolved. However, the August 1986 performance appraisal, which had been revised with white-out to reflect a three rating instead of a two, was *removed* from plaintiff's personnel file rather than restored. This action was recommended by Mr. Brill. According to Ms. Ellis at her deposition, to white-out plaintiff's two rating on his August 1986 appraisal and replace it with a rating of three without discussing such with plaintiff " 'violate[d] the Company's ethical standards.' " She changed her testimony during trial and denied such conduct was unethical. However, even at trial, she admitted whoever whited-out the rating of two without plaintiff's knowledge contravened company guidelines. Ms. Ellis believed the August 1986 appraisal should have been redone. At oral argument before this court, defendant's counsel admitted there was no evidence it was customary to remove an interim performance appraisal and replace it with an annual performance appraisal.

Despite this "resolution," plaintiff continued to complain and to request action. Ms. Ellis admitted she was aware plaintiff continued thereafter to raise complaints and concerns in interdepartmental communications (IDC's) to individuals in management. Among other things, plaintiff expressed concern about "tampering" with his personnel file, repeatedly requested the file be withheld from Mr. Rafelson's possession and control, and alleged management's poor perception of him arose in part because of a violation of defendant's "nepotism" policy.[9] Although Ms. Ellis saw those communications and made notes to herself concerning their content, she did not

[8]Ms. Ellis testified plaintiff had worked for Mr. Damon for only a short time and therefore an evaluation from him would have no "value or weight."

[9]In an IDC dated March 27, 1987, and addressed to Mr. Battle, plaintiff set forth his account of the difficulties with the C-NITE project. In a follow-up IDC dated March 31, 1987, and also addressed to Mr. Battle, plaintiff discussed his problems with an employee named Ephraim Shatz on the " 'specification tailoring' " project and alleged a relative also employed in the division, Bernard Shatz, might have intervened on Ephraim's behalf in contravention of company policy. In addition, plaintiff expressed "outrage" over "tampering" with his

investigate further "[b]ecause [plaintiff] did not come directly to [her] and complain about any of [what] . . . was mentioned . . . in those IDC['s]." Ms. Ellis never talked to Mr. Rafelson and made no effort to find out why the August 1986 appraisal had been whited-out and changed without plaintiff's knowledge.[10]

In June 1987, an IDC and "some other documents" concerning plaintiff were referred to the staff vice-president for human resources development, David Barclay. Mr. Barclay referred the matter to the corporate manager of defendant's equal employment opportunity programs, Mr. Mendoza, who "handles these kinds of matters." Mr. Barclay did not recall getting any response back from Mr. Mendoza.

In October 1987, plaintiff met with Allen MacAller, the ethics program manager for defendant. After talking with plaintiff, Mr. MacAller found no ethics violations "in the sense of [his] responsibility." His conclusion was in conflict with Ms. Ellis's conclusion at her deposition that the whiting-out of the two rating was done in an unethical fashion. Mr. MacAller and his superior, Mr. Hollingsworth, concluded this was a human resources matter. Mr. MacAller took no action other than to refer the matter back to EDSG management.

---

personnel file and stated: "I have asked Harland [Celestine] to take control of it for the present. I hope this has been done." Mr. Celestine testified he received and read plaintiff's IDC's dated March 27 and March 31. An IDC dated May 11, 1987, and addressed to Mr. Battle and Mr. Celestine contained a handwritten notation that "[u]nder no condition is my personnel folder to be returned to Rafelson or, PAL laboratories—further explanation will follow." In an IDC dated June 1, 1987, and addressed to Mr. Battle, plaintiff related his charges of tampering with his personnel file and requested that Mr. Rafelson not be allowed to control his personnel file. These IDC's were admitted into evidence subject to a limiting instruction. However, the limiting instruction was never given to the jury. This error is discussed in an unpublished part of this opinion.

Defendant's policy provided: " 'No employee is placed under the direct supervision of a relative or in such a position that his/her progress or assignments can be influenced by a relative.' " Mr. Battle received and read plaintiff's March 31 IDC concerning Bernard and Ephraim Shatz. Mr. Battle testified he believed Ms. Ellis was asked to look into that allegation, and he did not believe "we found any basis for the allegation." Ms. Ellis contradicted Mr. Battle and testified she did not investigate that accusation. The evidence at trial was in conflict with regard to plaintiff's culpability in his relationship with Ephraim Shatz. There was evidence which suggested Ephraim Shatz was to blame for the difficulties and animosity which arose between them, while other evidence suggested plaintiff was to blame. Plaintiff testified Mr. Rafelson told him Ephraim Shatz had complained to Mr. Goran about plaintiff; Mr. Rafelson also mentioned "possible involvement by Bernard Shatz." Plaintiff speculated intervention by Bernard Shatz had contributed to management's negative perception of him. Mr. Goran did not recall any conversation with Ephraim Shatz about plaintiff in late 1986. Bernard Shatz had left defendant's employ in November 1986.

[10]As noted above, at her pretrial deposition Ms. Ellis testified this action " 'violate[d] the Company's ethical standards.' "

Plaintiff repeatedly requested that his personnel file be withheld from Mr. Rafelson. Ms. Ellis testified plaintiff's file was returned to the department "where all . . . personnel files are maintained," because "we don't retain personnel files in human resources." Plaintiff testified Mr. Battle directed Mr. Celestine to "pick up" his file from Mr. Rafelson. Mr. Battle recalled plaintiff had asked human resources to take possession of his personnel file, but it was ultimately returned to Mr. Rafelson. Mr. Celestine testified he did not "pick up" plaintiff's personnel file from Mr. Rafelson as requested by plaintiff because "we in personnel were not the custodian of the folder . . . ."

5. *The layoff approval request*

In April 1987, plaintiff discovered a layoff approval request form and letter notifying him of this action in Mr. Rafelson's desk drawer. The layoff approval request form stated: "This request is made because of the Department's/Laboratory's shrinking business base and the realization Haycock is not an asset to our Laboratory. His abrasive attitude combined with lax schedule adherence have made him an organizational liability. . . . [¶] Haycock was not recommended for a merit salary increase during January, 1987 because he received a performance rating of 4. [¶] Haycock's performance deficiencies have been brought to his attention and documented in his Department personnel file. He has not displayed significant performance improvement although three Department Managers have counseled him (Rafelson-Glassen-McConnell)." Mr. Rafelson testified he based the "lax schedule adherence" statement on his discussions with Mr. Stubblefield and Mr. Shafer who supervised plaintiff on the C-NITE project. Mr. Rafelson stated at trial that Mr. Glassen and Mr. McConnell had told him they had counseled plaintiff in the past. The layoff approval form also stated: "I have not chosen to list in descending hire date order, junior and and [*sic*] younger employees occupying positions in the Division which could be performed by Haycock because this request is not only based on a shrinking business base, but also on poor performance." Mr. Rafelson testified he put this latter language in at the request of Ms. Ellis or with her "input" or that of Kimberlie Perkins, the personnel administrator for SEL. Following his discovery of the layoff approval request, plaintiff's relationship with Mr. Rafelson became "very hostile."

Mr. Rafelson could not recall when he had prepared the layoff approval request, but it was subsequent to his preparation of the revised 1986 performance appraisal assigning plaintiff an overall rating of four. He consulted with Ms. Ellis who advised him there was insufficient documentation in

plaintiff's personnel file to lay off plaintiff for cause.[11] Ms. Ellis explained to Mr. Rafelson that because plaintiff was a long-term employee, the decision to lay him off would have to be made at the corporate level. Mr. Rafelson testified he wrote "draft" on the layoff approval form and placed it in plaintiff's personnel file. According to Mr. Rafelson, this layoff approval request was "strictly a draft" and "was never pursued." It was never sent to human resources for approval.

Mr. Rafelson also prepared a "Notification of Layoff" dated January 23, 1987, which advised plaintiff the action was being taken "due to lack of funding" and "a shrinking business base," and "not due to [his] work capabilities." Mr. Rafelson admitted at trial he had put "numerous" IDC's critical of plaintiff into his personnel file. This was done without showing them to plaintiff. The documents were intended to remain in plaintiff's file.

### 6.  Plaintiff's applications for work outside SEL

In 1986 and 1987, plaintiff applied, unsuccessfully, for other positions for which he was qualified. The applications were made through defendant's career opportunity program. Plaintiff filed four applications in October 1986, and one in March 1987. The March 1987 application resulted in a commitment to hire plaintiff "pending review of [his] personnel file." He did not get the job.

In January 1987, Mr. Brill asked Mr. Rafelson to "find a new parent organization" for his section because SEL "just couldn't keep finding work." The alternative was "a layoff or breaking up of the section." Mr. Brill and Mr. Rafelson arranged to transfer the section to PAL under Mr. Morrison's control. Prior to accepting the section, Mr. Morrison reviewed the individual employee's personnel files. He was not happy with plaintiff's record. He noted poor performance over a 10-year period. Although plaintiff had received performance appraisal ratings of two "over a period of time," Mr. Morrison did not see any performance ratings of two.[12] He also observed the performance appraisal on which Mr. McConnell had written "rejected." On Mr. Rafelson's recommendation, however, he offered plaintiff a job. Mr. Rafelson's section joined PAL in March 1987. However, plaintiff was absent from work from July through November due to illness, and then vacation leave. Upon his return in early December 1987, plaintiff told Mr. Morrison

---

[11]During her pretrial deposition, Ms. Ellis testified she remembered telling Mr. Rafelson that plaintiff's personnel file did not contain adequate documentation to lay off plaintiff for cause. At trial, however, Ms. Ellis denied telling Mr. Rafelson there was insufficient documentation to lay plaintiff off for cause.

[12]This was in part because the August 1986 rating of two had been whited-out in violation of company rules and later removed from plaintiff's personnel record.

he did not want to work for Mr. Rafelson and he wanted another place in the lab. Mr. Morrison told plaintiff there were no other positions available. Plaintiff stated he would not work for Mr. Rafelson. One day later, Mr. Morrison learned plaintiff was retiring.

### III. DISCUSSION: THE APPEAL

#### A. *Sufficiency of the Evidence\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

#### B. *Implied in Fact Contract*

■ The trial court did not instruct the jury on the question whether there was an implied in fact contract not to discharge plaintiff absent good cause. Judge Morrow ruled as a matter of law that such a contract existed. The parties have raised no controversy concerning the application of the at-will doctrine in a constructive termination case. We apply binding Supreme Court authority and conclude the failure to submit the issue to the jury was reversible error.

■ Labor Code section 2922 provides: "An employment, having no specified term, may be terminated at the will of either party on notice to the other. Employment for a specified term means an employment for a period greater than one month." Labor Code section 2922 has been recognized as creating a presumption. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 665 [254 Cal.Rptr. 211, 765 P.2d 373].) The statute creates a presumption of at-will employment which may be overcome "by evidence that despite the absence of a specified term, the parties agreed that the employer's power to terminate would be limited in some way, e.g., by a requirement that termination be based only on 'good cause.' [Citations.]" (*Id.* at p. 677.) Evidence which may be considered in determining the existence of an implied in fact contract to terminate only for good cause includes: " '[T]he personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' [Citations.]" (*Id.* at p. 680.)

■ The California Supreme Court has held that the presumption of at-will employment exists because of public policy considerations. In *Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 727, footnote 12 [73 Cal.Rptr. 213, 447 P.2d 325], the court

---

*See footnote, *ante*, page 1473.

held: "Contracts of employment wherein the only consideration is the services to be performed thereunder and which are silent as to duration, are terminable at will upon reasonable notice *without regard to duration.* [Citations.] Special policy considerations require this result. '[T]he courts have not deemed it to be their function . . . to compel a person to accept or retain another in his [or her] employ, nor to compel any person against [her or] his will to remain in the employ of another. Indeed, they have consistently held that in such a confidential relationship, the privilege [to terminate] is absolute, and its presence of ill will or improper motive will not destroy it.' [Citation.]" (Original italics.) As will be discussed later, it is of importance that the presumption of at-will employment is premised upon public policy considerations. Because the presumption of at-will employment is premised upon public policy considerations, it is one affecting the burden of proof. (See 1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 178, pp. 151-154.)

In the present case, there was very strong evidence of an implied agreement to discharge only for good cause. Plaintiff had been continuously employed by defendant for more than 25 years, with the exception of a 1-year leave of absence. During those 25 years, he regularly received favorable performance ratings, "merit" salary increases, and was never the subject of disciplinary proceedings. Defendant's written layoff procedures afforded significant protection to long-term employees. The policy required supervisors whose employees were targeted for layoff to "attempt to locate alternative employment" for the employees within Hughes. In addition, defendant's policy provided: "Layoffs shall be utilized only when there is a lack of work or funds. Unsatisfactory employees should be discharged *for cause*, after following appropriate disciplinary procedures . . . ." (Italics added.) Ms. Carver's uncontradicted testimony was that a termination for cause required "documentation" and a reason for the firing. She stated without contradiction that more than a poor performance must be present; rather, the failure to work properly had to be documented historically during the employee's career. Under defendant's performance appraisal system, employees were given the opportunity to improve in areas of performance identified as unsatisfactory.

On the other hand, in addition to the presumption of at-will employment, there was evidence plaintiff admitted that in the 25 years he was employed, no employee of defendant had ever orally promised him permanent employment. Further, plaintiff was never told during his quarter century tenure he could be terminated only if good cause existed. Moreover, there was no evidence any other of the thousands of defendant's employees were subject to such a contractual arrangement. There was also a "practice" which

outlined "the basic Company employment practice" and which provided in relevant part: "*No commitments are made to any person regarding the duration of employment without Law office approval.*" (Italics added.) There was no evidence law office approval had ever been sought or obtained with respect to the duration of plaintiff's employment.

The existence of an implied contract to discharge only for good cause is normally a factual question for the trier of fact. (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d at pp. 677, 680, 682; *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 13-14 [267 Cal.Rptr. 618]; *Hejmadi* v. *AMFAC, Inc.* (1988) 202 Cal.App.3d 525, 540-541 [249 Cal.Rptr. 5]; *Walker* v. *Northern San Diego County Hospital Dist.* (1982) 135 Cal.App.3d 896, 905 [185 Cal.Rptr. 617].) In *Walker*, an appeal from a judgment on a directed verdict, there was evidence of employment documents and practices from which it could be reasonably inferred the employee was not subject to discharge without good cause. Division One of the Court of Appeal for the Fourth Appellate District stated: "Here . . . *the jury* had the duty to determine the existence or nonexistence of an express or an implied in fact promise for some form of continued employment absent cause for firing. A congeries of factual matters must be examined and resolved in order to determine this question. . . . These factual matters are for *the jury* (unless waived), *not the court*, to determine. [¶] . . . In light of the representations made through [the employer's] documents and practices, we cannot, nor could the trial court on this record state, as a matter of law, [the employee] was without right to a hearing or subject to discharge without procedural protection to determine the existence or lack of cause. Whether [the employee] had a written or oral or an implied in fact agreement for continued employment and termination only for cause are clearly issues of fact. These questions should have been submitted to the jury." (*Walker* v. *Northern San Diego County Hospital Dist.*, *supra*, 135 Cal.App.3d at p. 905, original italics.) The decisional authority does not impose a requirement that, in addition to relying on the presumption created by Labor Code section 2922, the employer produce evidence the employment was at-will in order to reach the jury on this issue. Only in limited circumstances not applicable to the present case has the issue been decided as a matter of law; that is, where a valid contract expressly provided the employment was at-will. (*Slivinsky* v. *Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 805 [270 Cal.Rptr. 585]; *Anderson* v. *Savin Corp.* (1988) 206 Cal.App.3d 356, 364 [254 Cal.Rptr. 627]; *Malmstrom* v. *Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 313-317 [231 Cal.Rptr. 820]; *Shapiro* v. *Wells Fargo Realty*

*Advisors* (1984) 152 Cal.App.3d 467, 482 [199 Cal.Rptr. 613].)[18] Because the question whether there existed an implied in fact contract to discharge plaintiff only for good cause was for the trier of fact to decide, it was error not to submit the issue to the jury.

However, in the present case, the aforementioned evidence plus the presumption warranted the matter being presented to the jury. Because the presumption embodied in Labor Code section 2922 is one affecting the burden of proof, it survives even though there is a conflict in the evidence. In the case of a presumption affecting the burden of producing evidence, the presumption can disappear from the case. (Cal. Law Revision Com. com., Deering's Ann. Evid. Code (1986 ed.) § 604, p. 248; *People* v. *Kelley* (1980) 113 Cal.App.3d 1005, 1010 [170 Cal.Rptr. 392]; *Slater* v. *Kehoe* (1974) 38 Cal.App.3d 819, 832-833 [113 Cal.Rptr. 790]; cf. *People* v. *Southern Pacific Co.* (1983) 139 Cal.App.3d 627, 632-633 [188 Cal.Rptr. 913].) Rather, because the Labor Code section 2922 presumption is one affecting the burden of proof, as previously noted, in the face of conflicting evidence, the issue must be presented to the jury so long as there is some logical basis for the presumption. (Cal. Law Revision Com. com., Deering's Ann. Evid. Code, *supra*, § 606, 251-252.) Therefore, once the plaintiff testified no promises of permanent employment had been made to him, defendant was entitled to the benefit of the presumption. Additionally, as noted previously, there was evidence: neither plaintiff nor any other employee had been orally promised permanent employment; plaintiff was never told that he could be terminated only in the face of a showing of good cause; no other employee had entered into such a contractual arrangement with defendant; and any commitment concerning the duration of employment had to be cleared with defendant's attorneys. The presumption plus these facts were sufficient to warrant the dispute being presented to the jury.

However, even if there was no substantial evidence plaintiff's employment was at-will, the presumption affecting the burden of proof created by Labor Code section 2922 would require the issue be submitted to the jury. In other words, the Labor Code section 2922 presumption, which affects the burden of proof, rather than of producing evidence, required the jury to decide the issue of whether plaintiff was an at-will employee. Although currently existing authority is murky, to say the least, particularly after the 1965 adoption of the Evidence Code, we conclude the allocation of the

[18]In *Miller* v. *Pepsi-Cola Bottling Co.* (1989) 210 Cal.App.3d 1554, 1559 [259 Cal.Rptr. 56], Division Two of this appellate district held evidence an employee had received two promotions and regular salary increases during eleven years with Pepsi was insufficient as a matter of law to rebut the presumption of at-will employment. We express no opinion regarding the reasoning of that decision. It will suffice to note that the facts in *Miller* are far different from those of the present case.

burden of proof, required the jurors to decide the issue. In other words, the presumption, itself, was sufficient to send the issue to the jury.

■ Prior to the adoption of the Evidence Code, a presumption was evidence. (*Smellie* v. *Southern Pac. Co.* (1931) 212 Cal. 540, 549 [299 P. 529].) However, this rule came under judicial and scholarly criticism. (*Speck* v. *Sarver* (1942) 20 Cal.2d 585, 591-598 [128 P.2d 16]) (dis. opn. of Traynor, J.); 1 Witkin, Cal. Evidence, *supra*, § 173, pp. 147-148.) As a result, Evidence Code section 600, subdivision (a) abrogated the holding of *Smellie* by stating, "A presumption is not evidence." (*Conservatorship of Geiger* (1992) 3 Cal.App.4th 127, 134 [4 Cal.Rptr.2d 252].) After the adoption of the Evidence Code, there were two kinds of presumptions. As noted previously, the present case involves a presumption affecting the burden of proof. The effect of a presumption relating to the burden of proof has been described by the Legislature as follows: "The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.) The Evidence Code defines the term " 'Burden of proof' " as "the obligation of a party to establish by evidence a requisite degree of belief concerning a fact *in the mind of the trier of fact* or the court." (Evid. Code, § 115, italics supplied.) Evidence Code section 606, as previously noted, indicates that a presumption affecting the burden of proof imposes upon the party against whom it operates "the burden of proof as to the nonexistence of the presumed fact." Evidence Code section 115 makes it clear that the obligation exists for that party to "establish by evidence a requisite degree of belief concerning a fact *in the mind of the trier of fact* or the court." (Italics supplied.) Hence, the presumption requires the party against whom it operates to prove its case to the trier of fact. (1c) Applied to the present case, plaintiff had the burden of proving to the jury that the presumption of Labor Code section 2922 was inapplicable to him. Stated differently, defendant could rely merely upon the presumption and force the issue of whether the employment was at-will to be determined by the trier of fact.

■ The foregoing statutory analysis is confirmed by the Assembly Judiciary Committee comment to Evidence Code section 606. That comment states: "If the party against whom the presumption operates already has the same burden of proof as to the nonexistence of the presumed fact that is assigned by the presumption, the presumption can have no effect on the case and no instruction in regard to the presumption should be given. See *Speck* v. *Sarver*, 20 Cal.2d 585, 590, 128 P.2d 16, 19 (1942) (dissenting opinion by Traynor, J.); Morgan, *Instructing the Jury Upon Presumptions and Burden of Proof* (1933) 47 Harv.L.Rev. 59, 69.) If the evidence is not sufficient to

sustain a finding of the nonexistence of the presumed fact, the judge's instructions will be the same as if the presumption were merely a presumption affecting the burden of producing evidence. See the Comment to Section 604. If there is evidence of the nonexistence of the presumed fact, the judge should instruct the jury on the manner in which the presumption affects the factfinding process. If the basic fact from which the presumption arises is so established that the existence of the basic fact is not a question of fact for the jury (as, for example, by the pleadings, by judicial notice, by stipulation of the parties), the judge should instruct the jury that the existence of the presumed fact is to be assumed until the jury is persuaded to the contrary by the requisite degree of proof . . . ." (Assem. Committee on Judiciary com., 29b West's Ann. Evid. Code (1966 ed.) § 606, pp. 569-570.)

The foregoing legislative comment referred to Justice Traynor's dissent in *Speck* v. *Sarver, supra,* 20 Cal.2d at pages 590-595. In that dissent, then Associate Justice Traynor wrote: "Rebuttable presumptions are thus no more than procedural devices for the fair apportionment between the litigants of the burden of going forward with the evidence. If the party against whom a presumption operates fails to come forward with substantial evidence tending to prove the non-existence of the facts presumed, his opponent with the burden of proof is entitled to an instruction that the facts exist. If he does come forward with such evidence, the jury must decide upon the existence of the facts. [Citations.]" (*Id.* at p. 592, (dis. opn. of Traynor, J.)) Further, the committee comment referred to Professor Edmund M. Morgan's 1933 Harvard Law Review article. That article also discussed the manner in which a presumption affecting the burden of proof applies. Professor Morgan noted: "If a presumption operates to fix the burden of persuasion, it will make no more difficult either the judge's task in framing the charge or the jury's duty of applying it. If the party against whom the presumption works already has the burden of persuasion that the presumed fact does not exist, the charge will be entirely unaffected by the presumption. Thus, if the plaintiff in ejectment is claiming as tenant for the life of X and the defendant is holding as remainderman, the plaintiff begins with the burden of showing X alive; and if the defendant establishes the unexplained absence of X for seven years, the plaintiff's burden of persuasion is not thereby affected, that is to say, if the minds of the jury by the evidence left in equilibrium on the question of X's continued existence, they must find for the defendant." (Morgan, *Instructing the Jury Upon Presumptions and Burden of Proof* (1933) 47 Harv.L.Rev. 59, 69.) Both Justice Traynor's dissenting opinion and Professor Morgan's analysis require a jury to weigh the effect of the

presumption against the any evidence presented by the party against whom it operates.[19]

Additionally, retired Dean and Presiding Justice Jefferson has noted that if there are basic facts which give rise to the presumption and there is evidence that the presumed fact is not true, the issue is to be presented to the jury. Retired Presiding Justice Jefferson wrote in his benchbook, "If a party, relying upon a presumption that affects the burden of proof, introduces evidence that tends to prove the existence of the basic facts giving rise to such presumption, and the party against whom the presumption operates does not introduce evidence that tends to prove the nonexistence of such basic facts, but, instead, introduces evidence that tends to prove the nonexistence of the presumed fact and such evidence is sufficient to support a finding of the nonexistence of such presumed fact: [¶] (a) The trier of fact must find that the presumed fact exists, unless the party against whom the presumption operates convinces the trier of fact, by a preponderance of the evidence, or by another burden-of-proof standard if applicable to such presumption, of the nonexistence of such presumed fact; and [¶] (b) If the trier of fact is the jury, the court should instruct the jury, without using the words 'presumed' or 'presumption' in the instruction, that the jury must find that a specified fact (the presumed fact) exists, unless the party against whom the presumption operates convinces the jury, by a preponderance of the evidence, or by another burden-of-proof standard if applicable to that presumption, of the nonexistence of such specified fact (the presumed fact)." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 46.3, pp. 1701-1702.) At another point, Retired Presiding Justice Jefferson drew the distinction between presumptions affecting the burden of producing evidence and proof as follows: "The difference in the operation of [a] presumption that affects the burden of proof and a presumption that affects the burden of producing evidence comes into play when the party against whom the presumption operates introduces evidence to establish the *nonexistence of the presumed fact* that is sufficient to sustain a finding of the nonexistence of that fact. In the case of the presumption that affects the burden of producing evidence, the presumption disappears, and the trier of fact must determine the existence or nonexistence of the presumed fact with no help from a

[19]One additional comment is in order. As noted in the body of this opinion, part of the Assembly Judiciary Committee comment indicates that if a party against whom the presumption operates already has the burden of proof as to the nonexistence of the presumed fact, the ". . . presumption can have no effect on the case and no instruction in regard to the presumption should be given." (Assem. Committee on Judiciary com., 29B West's Ann. Evid. Code, *supra*, § 606, p. 569.) However, the committee comment was referring only to the question of whether the judge would have to give a separate instruction to the jury when a party already had the burden of proof. As noted in the body of this opinion, the comment makes it clear that the issue still would be presented to the jury.

presumption, and *with no change in the burden of proof as between the parties.* [¶] But in the case of the presumption that affects the burden of proof, the presumption does *not* disappear in the face of evidence as to the *nonexistence* of the presumed fact. Once the trier of fact finds the existence of the basic facts of the presumption, the presumption that affects the burden of proof remains, the trier of fact *must* find that the presumed fact exists, unless the adverse party against whom the presumption operates *proves the nonexistence* of the presumed fact by a preponderance of the evidence . . . ." (2 Jefferson, *op. cit. supra,* at p. 1703; original italics; accord, BAJI (7th ed. 1986 bound vol.) appen. C, p. 335.) It is noteworthy that Retired Presiding Justice Jefferson also emphasizes that the burden of proof would not be affected in the case of a party who already had the responsibility of establishing a particular fact. (2 Jefferson, *op. cit. supra,* at p. 1705.) In other words, the burden of proof, regardless of the presumption, remains with plaintiff to prove that he was not an at-will employee. The effect of the presumption is to permit the issue to be presented to the jury.

To sum up, even if the evidence relied upon by defendant was not substantial evidence, the question of plaintiff's at-will employment still had to be presented to the jury. Quite obviously, it has been very difficult to reach this conclusion. Since the adoption of the Evidence Code, no court has addressed this issue. However, the express statutory language contained in Evidence Code sections 115 and 606 indicate that once a presumption affecting the burden of proof comes into play, that is an issue which must be presented to the *trier of fact.* Further, the comment provided by the Assembly Judiciary Committee and the secondary authority upon which it relies strongly suggest that a party who has the benefit of a presumption affecting the burden of proof may rely on that alone and force the opponent to prove his or her case. Finally, Retired Presiding Justice Jefferson's analysis is consistent with the foregoing conclusion. ■■■ Therefore, even if there was not substantial evidence of an employee's at-will status, the Labor Code section 2922 presumption of at-will employment was sufficient to require the matter be presented to the jury.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .*

C., D.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

IV.   DISCUSSION: THE CROSS-APPEAL*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

*See footnote, *ante,* page 1473.

## V. DISPOSITION

The judgment is reversed for the sole purpose of allowing a retrial on whether there was an implied in fact agreement not to terminate but for good cause and plaintiff's defamation cause of action. If the trier of fact concludes there was an implied covenant not to terminate but for good cause, the judgment is to be reinstated by the trial court plus any additional damages if the plaintiff prevails on his defamation claim if tort compensation may lawfully be awarded. In all other respects, the judgment is affirmed. Each side is to bear its own costs on appeal.

Armstrong, J., concurred.

A petition for a rehearing was denied February 28, 1994, and the petition of defendants and appellants for review by the Supreme Court was denied April 28, 1994.