[No. C033834. Third Dist. Apr. 24, 2000.]

LOREN REEVES, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, DEPARTMENT OF
CORRECTIONS et al., Respondents.

**COUNSEL**

Froba Law Offices and David J. Froba for Petitioner.

Richard Krimen; Robert W. Daneri; and David M. Goi for Respondents State of California, Department of Corrections and State Compensation Insurance Fund.

No appearance for Respondent Workers' Compensation Appeals Board.

## OPINION

**SCOTLAND, P. J.**—Loren Reeves (applicant), the chief engineer at one of California's state prisons, filed a claim for workers' compensation benefits, asserting he is entitled to a rebuttable presumption of industrial causation of heart trouble applicable to California Department of Corrections (CDC) employees "having custodial duties." (Lab. Code, § 3212.2; further section references are to the Labor Code unless specified otherwise.) The Workers' Compensation Appeals Board (WCAB) rejected applicant's argument because his "primary" duties are not custodial. We issued a writ of review.

Applicant contends the WCAB misinterpreted section 3212.2 when it concluded the statute applies only to a CDC employee whose *primary* duties consist of the supervision of inmates. We agree that the WCAB erred.

As we shall explain, section 3212.2 is not limited to those whose primary or principal duties for CDC are custodial. The unambiguous language of the statute applies to correctional officers and other employees of CDC who have *any* duties that are custodial in nature.

Because the WCAB erroneously deprived applicant of the benefit of the statutory, rebuttable presumption, we shall annul the WCAB's decision and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

As chief engineer at the Deuel Vocational Institution (DVI), applicant "has 12 to 14 supervisors working for him." He spends the vast majority of his time overseeing the shop, planning and laying out projects, doing paperwork, and ordering supplies. In addition, he performs all types of engineering jobs, including welding, fabricating, boiler maintenance, mechanic work, culinary maintenance, pneumatic work on hundreds of locks and gates, electrical work, and steam plumbing.

Applicant's responsibilities also include supervising inmates in his work area, and he covers for the machine and welding shop supervisor for "a couple of hours," three or four times a week. Thirteen inmates work in that volatile area, where they use tools and have the capability of making weapons. A custodial officer is assigned to cover the area in which the shops are situated, but the officer cannot stay in one shop because he has to roam the area. Applicant has supervised inmates working on the roof and in the utility tunnel. When the prison almost flooded in 1995, applicant had three inmates working under his supervision while they built levees for four months. In 1996, he did the same thing with two inmates for six weeks.

When supervising inmates, applicant maintains their time sheets and checks them in and out in the morning, at lunch, and in the evening. He checks on the inmates every hour or so to prevent them from wandering around. He makes sure they are not making weapons or liquor, and searches for contraband in the areas where they have been working. If he sees an inmate doing something wrong, applicant orders the inmate to correct the problem or leave the area. Applicant "writes up" inmates engaged in misconduct, and once helped to restrain an inmate who was fighting with a prison employee.

Although applicant carries a personal alarm and whistle, he does not carry a baton, handcuffs or a firearm. He does not search inmates' persons or cells, investigate incidents, or escort inmates to jobsites.

Applicant attends an annual training session regarding security issues. DVI teaches employees who are not correctional officers to observe incidents, report rule violations, secure areas, and sound alarms. Hands-on intervention with inmates is the responsibility of the correctional officers. However, other employees are not forbidden from intervening in fights.

The associate warden of DVI conceded that applicant has some custodial duties, e.g., accounting for tools, searching for tools, watching inmates throughout the day, preparing rule violation reports, and perhaps even patting down inmates if no correctional officer is available.

After applicant had a three-vessel coronary bypass operation in May 1996 and carotid artery surgery in the summer of 1996, he filed a claim for workers' compensation for cumulative trauma to his heart and cardiovascular system. By the time of his workers' compensation hearing, he had returned to work full-time without work restrictions.

At the workers' compensation hearing, applicant relied on the medical report of Dr. Samuel Sobol, who had examined applicant but was unable to review his medical records. The report indicates applicant stated he first developed cardiovascular symptoms after suffering an injury to his back at work in April 1996, claimed he was exposed to the same stresses of working with inmates as correctional officers, and said he occasionally would become angry with the inmates and staff members. Sobol noted that applicant had several risk factors for coronary artery disease, including his age and gender, a history of smoking two packs of cigarettes a day for 25 years until 1980, an elevated cholesterol level, and weight gain.

Dr. Sobol opined it was medically probable that "the sequelae of [applicant's] back injury in early April of 1996 caused any preexisting and

underlying coronary atherosclerotic disease to become manifest" but that, without a review of the medical records, it was difficult to determine whether cumulative stress from the sequelae of the work injury led to a progression of the underlying coronary disease to the point that symptoms occurred and surgery became necessary. Sobol believed it was "more difficult to state" whether the stresses of applicant's employment prior to the back injury aggravated or accelerated the coronary artery disease given the absence of frequent anger or emotional situations in the workplace, applicant's easygoing demeanor and behavior, and his absence of "type A" behavioral characteristics. Sobol concluded that, if "the presumption afforded a correctional officer applies to [applicant], . . . then, according to this statute, there would be considered to have been present a cumulative occupational contribution to his underlying coronary artery disease."

CDC, on the other hand, relied on the medical report of Dr. Thomas Leonard, who both examined applicant and reviewed his medical records. In addition to noting that applicant said his job is not stressful, Leonard indicated applicant smoked two packs of cigarettes a day for 20 years until 1980, has been obese, and has hyperlipidemia.[1]

Dr. Leonard opined that, "[i]n all probability [applicant] would have suffered his illness absent his responsibilities . . . with the Department of Corrections," and thus applicant's illness has no industrial causation.

The workers' compensation administrative law judge (WCJ) denied applicant's claim for heart and cardiovascular system workers' compensation benefits. The WCJ concluded that the presumption of industrial causation of heart trouble set forth in section 3212.2 does not apply, and that Dr. Leonard's medical report was more persuasive regarding industrial causation.

Applicant petitioned the WCAB for reconsideration, arguing the WCJ erred in failing to apply the section 3212.2 presumption.

The WCAB granted reconsideration, but affirmed the order of the WCJ in a split opinion. The majority reasoned that the presumption found in section 3212.2 applies solely to CDC employees whose *primary* duties consist of the supervision of inmates, and concluded that applicant's duties do not involve sufficient custodial duties to warrant application of the presumption. The

---

[1]"Hyperlipidemia" or "lipemia" is "[t]he presence of an abnormally large amount of lipids in the circulating blood." "Lipids" are "substances extracted from animal or vegetable cells by nonpolar or 'fat' solvents . . . ." (Stedman's Medical Dict. (24th ed. 1982) pp. 673, 800.)

majority also held "that without regard to the presumption, the opinion of Dr. Leonard is substantial evidence to justify finding no industrial injury." The dissent asserted that section 3212.2 "does not quantify the degree of custodial duties and neither should we."

DISCUSSION

Applicant contends the WCAB misinterpreted section 3212.2 by limiting its application to those CDC employees whose primary duties are custodial in nature.

"Although the WCAB's findings on questions of fact are conclusive (§ 5953), the construction of a statute and its applicability to a given situation are matters of law that are reviewable by the courts. An erroneous interpretation or application of law by the WCAB is a ground for annulment of the WCAB's decision." (*Rex Club v. Workers' Comp. Appeals Bd.* (1997) 53 Cal.App.4th 1465, 1470-1471 [62 Cal.Rptr.2d 393].)

In construing a statute, we are guided by the rule that "[t]he Legislature is presumed to have meant what it said and the plain meaning of the language governs. . . . When the words are clear, there is no room for interpretation. . . ." (*Western Growers Ins. Co. v. Workers' Comp. Appeals Bd.* (1993) 16 Cal.App.4th 227, 240 [20 Cal.Rptr.2d 26], citations omitted.)

Section 3212.2 states in pertinent part: "In the case of officers and employees in the Department of Corrections having custodial duties, each officer and employee in the Department of Youth Authority having group supervisory duties, and each security officer employed at the Atascadero State Hospital, the term 'injury' includes heart trouble which develops or manifests itself during a period while such officer or employee is in the service of such department or hospital. [¶] . . . [¶] Such heart trouble so developing or manifesting itself in such cases shall be presumed to arise out of and in the course of the employment. This presumption is disputable and may be controverted by other evidence, but unless so controverted, the appeals board is bound to find in accordance with it. . . ."

This statutory language is unambiguous. It applies to "officers" and "employees" of CDC "having custodial duties." Nothing in the statute limits its reach to those CDC employees whose duties are primarily custodial.

Indeed, section 3212.2 stands in sharp contrast to other presumption statutes found in the same chapter of the Labor Code, i.e., chapter 1 of part 1 of division 4, that expressly limit their application to those employees

whose duties "primarily" or "principally" involve law enforcement or active firefighting. (E.g., §§ 3212 [hernia, heart trouble and pneumonia presumptions apply to members of warden service of Department of Fish and Game whose "principal duties consist of active law enforcement service," but *not* to members of fire departments whose "principal duties are clerical"]; 3212.1, subd. (a) [cancer presumption applies, inter alia, to peace officers "who are primarily engaged in active law enforcement activities"]; 3212.4 [heart trouble, hernia and pneumonia presumptions do *not* apply to members of University of California fire departments "whose principal duties are those of a telephone operator, clerk, stenographer, machinist, mechanic, or otherwise, and whose functions do not clearly fall within the scope of active firefighting and prevention service"]; and 3212.6 [tuberculosis presumption applies to members of police departments, sheriff's offices, and district attorney's investigator staffs "whose principal duties consist of active law enforcement service" and to employees of other specified public agencies "excepting those whose principal duties are clerical or otherwise do not clearly fall within the scope of active law enforcement, firefighting, or emergency first-aid response service"]; cf. § 4850, subd. (b).)

Because the Legislature did not limit section 3212.2 to CDC employees whose "principal" or "primary" duties are custodial, unlike the limitations imposed in the similar statutes cited above, we must infer that the Legislature intended the statute to apply to all CDC officers and employees who have *any* duties that are custodial in nature. (*People v. Valentine* (1946) 28 Cal.2d 121, 142 [169 P.2d 1]; *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1827 [46 Cal.Rptr.2d 198] ["if a statute on a particular subject omits a particular provision, inclusion of that provision in another related statute indicates an intent the provision is not applicable to the statute from which it was omitted"]; *Craven v. Crout* (1985) 163 Cal.App.3d 779, 783 [209 Cal.Rptr. 649] ["Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent"].)[2]

Applicant presented substantial evidence that some of his duties are custodial, which is defined as "relating to or marked by guardianship or

---

[2]Two decisions relied upon by the WCAB are inapposite. (*Biggers v. Workers' Comp. Appeals Bd.* (1999) 69 Cal.App.4th 431 [81 Cal.Rptr.2d 628] [construed § 4850, which is limited to sheriff's officers whose "principal duties" are not clerical or mechanical and whose duties "clearly fall within the scope of active law enforcement service"]; *Enea v. Workers' Comp. Appeals Bd.* (1997) 62 Cal.Comp.Cases 510 [addressed § 3212, which has the same limitations as § 4850].) And a decision cited by CDC supports our conclusion. (*Parks v. Workers' Comp. Appeals Bd.* (1992) 57 Cal.Comp.Cases 213 [the WCAB applied the § 3212.2 presumption to a CDC medical technical assistant who performed some custodial duties]; see *Parker v. Workers' Comp. Appeals Bd.* (1992) 9 Cal.App.4th 1636, 1646 [12 Cal.Rptr.2d 370]

maintaining safely . . . ." (Webster's 3d New Internat. Dict. (1993) p. 559.) Indeed, DVI's associate warden conceded that at least some of applicant's duties are custodial. Applicant supervises inmates in his work area, and watches over inmates in another area three or four times a week, often alone; supervises inmates when making emergency repairs, on some occasions without the presence of a correctional officer; supervises two other inmates in his office; has to watch the inmates closely to make sure they do not wander off, make weapons or liquor, or otherwise engage in misconduct; writes up a rule violation report when an inmate breaks a prison rule; and searches for weapons or other contraband in the areas where the inmates work. These are custodial duties.[3]

*Holt v. Workers' Comp. Appeals Bd.* (1986) 187 Cal.App.3d 1257 [232 Cal.Rptr. 442] (*Holt*) is not to the contrary. In that case, the WCAB calculated the permanent disability of a boiler room tender at the Susanville Prison by using an "occupational variant" labeled "stationary engineer/boiler room tender—custodial duties." Arguing that he was entitled to greater benefits by application of a higher occupational variant for other employees having "custodial duties," the employee petitioned for writ of review. (*Id.* at pp. 1259-1260.) He asserted that administrative regulations requiring CDC employees "to prevent escapes or disorder, report rule violations, and to maintain the security and safety of the institution" establish a conclusive presumption that all CDC employees have custodial duties. (*Id.* at p. 1261.) *Holt* disagreed, explaining that CDC regulations indicate custodial duties may be imposed on "all employees" of CDC only in emergencies. Because the employee presented no evidence that he ever actually performed custodial duties, he was not entitled to the greater benefits received by CDC employees who perform such duties. (*Id.* at pp. 1261-1262.)

*Holt* did not reach the question whether preventing escapes or disorder, reporting rule violations, and maintaining the security and safety of the institution constitute custodial duties. In dicta, *Holt* noted it would be absurd to adopt the conclusive presumption sought by the employee, explaining that

["writ-denied" summaries of WCAB decisions published in the California Compensation Cases may be cited].)

In interpreting section 3212.2, the WCAB also looked for guidance to a regulation which defines "custodial personnel" as "those officers with the rank of deputy, correctional officer, patrol persons, or other equivalent sworn or civilian rank whose primary duties are the supervision of inmates." (Cal. Code Regs., tit. 15, § 1006.) However, this regulation is inapposite because it does not purport to define "custodial duties."

[3]Because applicant performs custodial duties, we are not presented with the question whether the presumption set forth in section 3212.2 applies to a CDC officer or employee whose job description includes custodial duties, but who has never actually performed such duties.

to do so "would eliminate any occupational distinction among [CDC] personnel for disability rating purposes—i.e., clerical personnel or kitchen staff would be rated on the same disability level as the prison guards. The inappropriateness of such a rating scheme is obvious." (*Holt, supra,* 187 Cal.App.3d at p. 1261.) However, this observation was directed to the claim that there was a conclusive presumption that all CDC employees perform custodial duties, and addressed distinctions among CDC occupations for purposes of permanent disability ratings. *Holt* did not consider the entirely different question whether the Legislature intended the "heart trouble" presumption of section 3212.2 to apply to all CDC employees who perform custodial duties.

The Legislature apparently has concluded that performing custodial duties involving prison inmates is necessarily stressful and, thus, the heart trouble presumption should apply to CDC employees performing any custodial duties.

The final question posed in this case is whether we may affirm the WCAB's decision on the ground Dr. Leonard's medical report constitutes substantial evidence that applicant did not sustain a heart or cardiovascular injury arising out of and in the course of his employment.

The presumptions of industrial causation found in section 3212 et seq. are rebuttable; and, because they reflect public policy, they are presumptions affecting the burden of proof. (*Zipton v. Workers' Comp. Appeals Bd.* (1990) 218 Cal.App.3d 980, 988, fn. 4 [267 Cal.Rptr. 431]; *Gillette v. Workmen's Comp. Appeals Bd.* (1971) 20 Cal.App.3d 312, 319-320 [97 Cal.Rptr. 542].) "The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.)

Accordingly, CDC has the burden to prove that applicant's heart trouble did not arise out of and in the course of his employment.

Although the WCAB found that Dr. Leonard's opinion constitutes substantial evidence of a lack of industrial causation, it expressly did so "without regard to the presumption." In other words, it did not consider whether Leonard's opinion was sufficient to overcome the presumption that applicant's heart trouble was industrially caused. Moreover, the WCAB opinion is flawed by the majority's misconception that Dr. Sobol was unaware of applicant's heavy cigarette use.

Because the WCAB erroneously deprived applicant of the benefit of the statutory, rebuttable presumption of section 3212.2, its decision must be annulled, and the matter must be remanded for further proceedings.

## DISPOSITION

The WCAB's "OPINION AND ORDER GRANTING RECONSIDERATION AND DECISION AFTER RECONSIDERATION" is annulled. The matter is remanded for further proceedings consistent with the views expressed herein.

Nicholson, J., and Hull, J., concurred.