[No. A122448. First Dist., Div. One. Aug. 11, 2010.]

BAY GUARDIAN COMPANY, Plaintiff and Respondent, v.
NEW TIMES MEDIA LLC et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IV. and V. of the Discussion.

**COUNSEL**

Reed Smith, Paul D. Fogel, Raymond A. Cardozo, Dennis Peter Maio; Kerr & Wagstaffe, H. Sinclair Kerr, Jr., James M. Wagstaffe, Ivo Labar; and Don Bennett Moon for Defendants and Appellants.

Joseph A. Hearst; E. Craig Moody; Ralph C. Alldredge; and Richard P. Hill for Plaintiff and Respondent.

**OPINION**

**DONDERO, J.**—The Bay Guardian and the San Francisco Weekly are competing alternative newspapers in the San Francisco Bay Area. Each paper relies on advertising revenue in large part to sustain the publication of the news weekly. San Francisco Weekly offered advertising to business entities at a rate lower than was provided by the Bay Guardian. Consequently, the Bay Guardian Company sued San Francisco Weekly for unfair competition under California law. It was successful and won a jury verdict of approximately $16 million.

This appeal has been taken by defendants New Times Media LLC (the New Times), San Francisco Weekly (the SF Weekly), and East Bay Express (the Express), from a judgment that awarded plaintiff Bay Guardian Company (the Guardian) damages in an action for violations of Business and Professions Code section 17043 based on sales of advertising at rates below cost for

the purpose of harming a competitor.[1] Defendants claim that the trial court erred by failing to admit defense evidence and properly instruct the jury on the essential element in a section 17043 action of proof of defendant's ability to recoup losses. Defendants also argue that the court gave defective instructions on the intent or "purpose" to harm a competitor and the statutory presumption of improper purpose stated in section 17071. They further assert that the evidence presented by plaintiff failed to adequately prove the element of damages caused by the below-cost sales, or that the New Times and the Express were agents of the SF Weekly so as to incur liability to plaintiff pursuant to section 17095.

We conclude that recoupment of losses by defendant is not a requirement to prove a violation of section 17043. Therefore, the trial court did not err by failing to instruct the jury on recoupment of losses as an element of the action, by limiting the presentation of defense evidence on recoupment, or by denying defendants' motions for judgment based on lack of evidence of recoupment. We also conclude that the court's instructions on the purpose to harm a competitor and the statutory presumption of improper purpose were not erroneous. Substantial evidence supports the finding of damages suffered by plaintiff, and the agency relationship between the SF Weekly and the New Times. The judgment against the Express must be reversed for lack of evidence that it acted as an agent of the SF Weekly to sell advertising at rates below cost in violation of section 17043. Otherwise, we affirm the judgment.[2]

---

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated.

[2] Following oral argument and submission of the case (Cal. Rules of Court, rule 8.256(d)(1)), the parties notified us that a settlement in the matter has been reached pursuant to Code of Civil Procedure section 664.6, although they have not as yet filed a stipulation for dismissal of the proceedings. Settlement of the case would of course render the appeal moot, but not require that we dismiss the appeal. (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 300, fn. 4 [106 Cal.Rptr.2d 906]; *Lucich v. City of Oakland* (1993) 19 Cal.App.4th 494, 502 [23 Cal.Rptr.2d 450]; *In re Marriage of Dade* (1991) 230 Cal.App.3d 621, 627 [281 Cal.Rptr. 609]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2009) ¶¶ 5:64 (rev. # 1, 2007), 6:125.1 (rev. # 1, 2009).) Dismissal of the action at this extraordinarily late stage of the proceedings based on settlement or stipulation of the parties is discretionary rather than mandatory. (*City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114, 1121, fn. 5 [84 Cal.Rptr.2d 361].) Because this action presents issues of continuing public interest which are likely to recur, we exercise our inherent discretion to resolve those issues despite the potential settlement. (*Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 218, fn. 2 [127 Cal.Rptr.2d 169, 57 P.3d 647]; *Liberty Mut. Ins. Co. v. Fales* (1973) 8 Cal.3d 712, 715–716 [106 Cal.Rptr. 21, 505 P.2d 213]; *Castro v. Superior Court* (2004) 116 Cal.App.4th 1010, 1014, fn. 3 [10 Cal.Rptr.3d 865]; *Black Diamond Asphalt, Inc. v. Superior Court* (2003) 114 Cal.App.4th 109, 115 [7 Cal.Rptr.3d 466]; *Rosales v. Thermex-Thermatron, Inc.* (1998) 67 Cal.App.4th 187, 191, fn. 1 [78 Cal.Rptr.2d 861].)

## STATEMENT OF FACTS

The Guardian was first published in October of 1966 in San Francisco as an "alternative" newspaper of "tabloid size," published weekly and distributed free of charge. The Guardian targeted a young, educated, affluent audience, more focused on alternative views and lifestyles than daily newspapers such as the San Francisco Chronicle or San Francisco Examiner. Without any revenue from circulation, the Guardian relied almost exclusively on sale of advertising space in the paper to produce income. The Guardian sold two forms of advertising: classified advertising, which was primarily personal in nature and was placed in the back of the paper; and display advertising, which was purchased by local retail businesses and sold "modularly" as a larger portion of a page of the newspaper. During the first six years of existence the Guardian struggled, and was published only irregularly. By 1995, however, the Guardian became the dominant weekly newspaper in the San Francisco Bay Area. Between 1985 and 1995, revenues grew from $2 million to $8 million, and then to over $11 million by 2000, of which $7.6 million was attributable to display advertising.

Over the years the Guardian did not primarily compete with the radio or "even the daily" newspapers, but rather with other "non-daily papers," which also had "alternative" editorial content. One of the Guardian's competitors was defendant SF Weekly, which in 1995 principally focused "on the music scene in San Francisco," and had a target demographic of 18 to 40 years of age.

Defendant the New Times decided to acquire the SF Weekly in 1995 to enter the vibrant San Francisco journalism market. At the time the SF Weekly was a marginally profitable newspaper of under 70 pages per edition, which had a circulation of about 90,000—about half that of the Guardian. The objective of the acquisition of SF Weekly was to increase circulation and improve content by bringing more "magazine-length journalism into the paper." Thus, from 1995 to 2000 the journalism staff of the SF Weekly was increased significantly, as was the editorial size of the paper, its circulation, number of advertisers, and total revenue.

The Guardian adduced evidence at trial that soon after the acquisition the executive editor of the New Times, Mike Lacey, disparaged the content of both the SF Weekly and the Guardian at a staff meeting, and announced that he wanted "the SF Weekly to be the only game in town." The Guardian was considered the primary competitor of the SF Weekly. Lacey stressed that the New Times had "deep pockets," with the financial resources to "compete very

---

Additionally, this court consulted the parties regarding the possible partial publication of the decision in this case. The court has received written reply from counsel for the parties that both sides agree the publication of an opinion in this case is appropriate under California Rules of Court, rule 8.1110(c).

aggressively" with the Guardian and use "guerilla tactics" in rate battles. Lacey also emphasized that he was interested in improving the editorial quality of the SF Weekly. To increase circulation, additional salaried journalists were hired to bring higher quality "long form journalism" to the paper. The essence of Lacey's message was that he wanted "to put the Bay Guardian out of business."

One of the "new policies" implemented at the SF Weekly was to specifically target businesses which advertised in the Guardian. The previous advertising policy of the SF Weekly, like that of the Guardian, was to set the advertising "rate card" based on the "overhead costs" of publishing the newspaper, plus a variable percentage, depending on the frequency of the customer's advertising. Rates were structured on a "graduated frequency discount" scale, with customers who advertised "52 weeks throughout the year" offered a lower rate than a "one time customer." Ads were sold according to "the frequency earned."

Following the acquisition of the SF Weekly by the New Times, sales representatives were authorized to directly contact advertisers in the Guardian and offer "to sell advertising at a lower frequency" than was earned to transfer their business to the SF Weekly. The sales representatives were made aware that advertising could be sold "below cost" if needed "in order to make a sale," and the resources of the New Times would cover the losses, even over a term of many years. For example, the SF Weekly began to offer Bay Guardian advertisers the rate for "52 times, even if the advertiser only agreed to run for one week."

Furthermore the SF Weekly identified "key categories" of advertising emphasis in the newspaper, such as restaurants, fitness clubs, health and beauty, music and film, and furniture. To increase volume in those categories, the strategy of SF Weekly was to "initially lower the [introductory] rate" to advertisers to "build up a certain amount of critical mass," then once volume was established "slowly increase the rates" over time of both the "re-signs" and "new advertisers."

The Guardian recognized that SF Weekly had become a threatening competitor, along with Internet publishing. Both newspapers appealed to essentially the same demographic and attracted many of the same advertisers. Competition between the two newspapers for advertisers was "pretty intense." The fundamental objective of the Guardian was essentially the same as the SF Weekly: to become dominant in the San Francisco marketplace.

In March of 2001, the New Times acquired another alternative weekly newspaper, the Express, which then had a circulation of about 60,000 to

65,000. The Express, which was based in Oakland, offered advertising customers a slightly different geographical region of exposure than the Guardian or the SF Weekly, and in conjunction with the SF Weekly provided a greater coverage area and circulation than the Guardian alone. As with the SF Weekly, the "approach" of the New Times was to improve the editorial quality of the Express and increase circulation. The Express provided reduced rates to advertising customers, which it intended to "slowly raise" over time. Despite its lower circulation the Express charged higher advertising rates than the SF Weekly, although lower rates than the Guardian. Once the Express was acquired by the New Times, to entice prospective advertisers "away from the Guardian" the SF Weekly also offered free advertisements in the Express. The New Times anticipated losses at the Express while the paper was developed and expanded.

Thereafter, through 2007, the SF Weekly and the Express continued to offer advertising, particularly to advertisers in key categories, at rates at least 20 percent below those charged by the Guardian, below the "rate card" prices, and well below its own costs per inch of display advertising space. According to the calculations of plaintiff's expert, the SF Weekly's average advertising space costs ranged from $21 per inch in 2001 to $29 per inch in 2007, whereas the average sale price of advertising space varied from $17 per inch in 2002 to $20 per inch in 2007. For the same time period, the Guardian's advertising costs per inch of paper ranged from nearly $23 in 2001, to $18 in 2004, and $20 in 2007; its display revenue per inch was nearly $23 in 2001, $18 in 2004, and nearly $22 in 2007.

As a result of reduced-price advertising offered by the SF Weekly, the Guardian consistently lost other advertising customers and revenue to the SF Weekly after 1995, even though the Guardian had 20 percent greater distribution in San Francisco—and therefore theoretically should have received a 20 percent greater price for advertising. An examination of customer account ledgers for 128 customers and over 20,000 advertising transactions with the Guardian and the two "New Times papers" between 1999 and the first quarter of 2007 revealed that 91 percent of the advertising sales transactions of the SF Weekly and Express were below cost. For approximately 66.5 percent of those transactions the Guardian either lost customers to defendants' papers or was compelled to discount advertising rates to remain competitive.

As an illustration, by offering reduced rates to advertisers the SF Weekly managed to obtain the critical print advertising account of Bill Graham Presents (BGP), a major concert producer which historically advertised

heavily in the Guardian.[3] After the acquisition by the New Times, BGP consolidated more of its advertising budget with the SF Weekly, 75 to 80 percent, at favorable, below-cost rates, while at the same time reducing its overall print promotion in favor of "radio and online advertising." Then in 2005, BGP entered into a "sponsorship agreement" to direct to the SF Weekly a minimum annual display advertising purchase of $350,000 or 90 percent of its advertising budget in alternative newspaper publications in the Bay Area market, whichever was greater.[4] In exchange, the SF Weekly paid an annual "sponsorship" fee to BGP for "naming rights" to the Warfield Theatre owned by BGP, and was given exclusive advertising rights associated with that venue. The advertising prices charged to BGP by the SF Weekly under the sponsorship agreement were above previous rates, but still below cost. Before the sponsorship agreement, BGP spent approximately $160,000 per year in advertising with the Guardian. As a result of the agreement between BGP and the SF Weekly, the Guardian subsequently received only a fraction of its previous advertising revenue from BGP, and lost "hundreds of thousands" of advertising dollars.

In 2004, the Guardian began a program to match the SF Weekly's lower advertising prices to some customers on a "case by case basis" by giving discounts, "free ads" and "upsizes" in the paper. The program lasted two or three years, but did not appreciably abate the Guardian's revenue losses. Between 2000 and 2007 the Guardian suffered a loss of display advertising revenue of about 50 percent, and earned a total profit of $1.2 million.

The Guardian and the SF Weekly also lost advertising revenue, particularly "classified business," to Internet providers such as Craigslist, which attracted the youthful demographic targeted by both papers. The "dot com" bust in the San Francisco Bay Area in 2001 further caused appreciable loss of display advertising revenues for both papers, as did the ensuing more general recession. The Guardian increased advertising revenues between 1996 and 2000, but suffered substantial loss of income between 2000 and 2007.[5]

Despite increases in circulation and advertising revenue, between 1995 and 2007 the editorial expenses for the SF Weekly and the Express increased dramatically, and with the exception of 2000 and 2001 the papers lost money every year that the New Times parent company was forced to "cover." The

---

[3] BGP as an independent concert promoter became part of Live Nation, a large conglomerate of entertainment entities.

[4] The annual amount was subsequently reduced from $350,000 to $330,000. The agreement also gave BGP discretion to allocate the annual minimum print placement to SF Weekly or the Express.

[5] Display advertising revenue figures for the SF Weekly and the Guardian, respectively, were as follows: $1.76 and $5.48 million in 1996; $5.25 and $7.84 million in 2000; and $4.32 and $4.51 million in 2007.

New Times sold the Express in 2007, due to lack of "progress financially," for much less than the acquisition price six years earlier.

Plaintiff offered expert opinion testimony from CPA Clifford Kupperberg, presenting an analysis of damages suffered by the Guardian as a result of defendant's advertising price structure. Kupperberg suggested several models for the calculation of plaintiff's damages, which he characterized as the revenue or profits the Guardian would have earned during the "damage period" established by the court—the fiscal years 2001 through 2007—"but for" defendants' below-cost advertising. Kupperberg acknowledged that a damage analysis of "something that didn't happen" can "never be perfect," but through his methodology of examining "comparable" situations he attempted to discern the "most reasonable measure of damages."

In one model Kupperberg assumed that between 2001 and 2007 the Guardian would have continued to charge the same rate for advertising space—that is, $2,270 per page—as it had for the five years (1996–2001) before the below-cost pricing "damage event." The total amount of damages according to this model, without any increase in advertising volume, was $4,856,000.

A different "comparable model" approach took into account an increase in the Guardian's "display revenue achievement" in the damages period at a rate or percentage equivalent to the two other "most comparable" Bay Area weekly newspapers (the Bay weeklies)—those being the Palo Alto Weekly and the Pacific Sun—or alternative newspapers operated elsewhere by the New Times (the New Times weeklies), that were not impacted by the SF Weekly's pricing structure. Those projected profits were then compared to the actual expenditures, profits and losses of the Guardian during the same damages period. As so calculated the total projected damages ranged from a low of $7.3 million as measured by the Bay weeklies to a high of $10.2 million as measured by the New Times weeklies.

Kupperberg also calculated damages according to a "minimum change" model, based on a projection that the Guardian would not have lost any net market share to the SF Weekly during the damages period in the absence of below-cost pricing. Assuming the Guardian maintained its revenues for the damages period, the total calculated damages were between $4 and $5.2 million. Kupperberg felt that the minimum change model did not give "a complete picture of the loss" because it was not adjusted for the higher prices the Guardian could have charged for the lost sales without the unfair practices.

The calculation of damages under Kupperberg's models ranged from a low of $4,083,748 to a high of $11,834,570.[6] Kupperberg asserted that all of the models he described, although imperfect, "could be representative of what happened," but the most "appropriate" method of calculation depended on the jury's "view of the facts." He also testified that a calculation of damages based on an examination of individual transactions was both impractical—due to the hundreds of thousands of transactions at issue—and inaccurate given the impossibility of knowing which "transactions would have gone to [the] Bay Guardian absent the [be]low-cost pricing."

Defendants countered with expert opinion testimony by accountant Everett Harry that Kupperberg's models were based on faulty assumptions as to potential earnings during the damages period, and failed to follow established accounting guidelines for certainty. Harry formed the opinion that Kupperberg's models and ultimate analysis of damages were "unreasonable, unsupported based upon speculation" and "completely exaggerated." The range of Kupperberg's damage estimates, asserted Harry, "is far too wide to pass a reasonableness test." Harry testified that the evidence of damages presented by plaintiff failed to consider competition for advertising from the Internet, direct mail advertising, other free newspapers such as the San Francisco Examiner, and entertainment inserts in the San Francisco Chronicle. He also considered the cost plus 6 percent revenue model used by Kupperberg for calculating damages unreasonable, as based on an erroneous assumption of a price per page for display advertising that the Guardian could not have continued to charge during the damages period.

Defendants also presented expert opinion testimony to prove that the SF Weekly was not seeking to harm the Guardian as a competitor with its advertising pricing scheme. Economics professor Joseph Kalt testified that below-cost pricing by the SF Weekly for the purpose of injuring competition would "not make sense from a business or economic point of view." Kalt reasoned that the SF Weekly possessed neither the "market power" to control the alternative newspaper market and drive out competition, nor the protection from competitors to ultimately raise prices and recover the losses, both of which are required to make below-cost pricing a rational, sensible act from a business perspective. Kalt examined the economic data and market trends, including increased Internet competition, and found that the SF Weekly failed to increase its revenues from below-cost pricing or drive the Guardian and other competition from the market.

---

[6] In his prior deposition Kupperberg reached a different calculation of the Guardian's lost revenues during the damages period based on use of statistics from the Association of Alternative Newspapers. Before trial Kupperberg repudiated his prior method of calculation because he decided it was based on lack of "comparable" information.

In rebuttal, plaintiff presented evidence that corroborated the essential enduring profitability of weekly alternative newspapers in the Bay Area during the damages period, in the form of testimony from William Johnson, who published the two Bay weeklies—the Palo Alto Weekly and the Pacific Sun—used as comparables in Kupperberg's model. Many of the advertisers in the Guardian and the SF Weekly also advertise concurrently in these two Bay weeklies. Johnson testified that the damage analysis by Kupperberg properly compared the Guardian and the SF Weekly with the Bay weeklies he published in terms of content, circulation, marketing strategies and advertising revenues. He added that the New Times weeklies, with the exception of geography, were also "quite comparable" to the Guardian and the SF Weekly.

Johnson offered the opinion that the revenue and profit figures given by Kupperberg were correct. According to Johnson, the alternative weekly newspapers did not suffer from the "business downturn" during the damages period or the increase in Internet advertising in the same way as did daily newspapers. He testified that the relocation of advertising revenues from the daily newspapers to the Internet has not occurred to any appreciable degree with nondaily newspapers.[7] Johnson observed "no impact" on any of his papers from Internet advertising. Both the Palo Alto Weekly and the Pacific Sun, which were not affected by the SF Weekly's below-cost advertising, realized an average "gradual increase in display advertising revenues" and profits during the damages period.[8] Johnson further testified that an offer by a competitor of advertising rates below the rate card has a "very large impact" on pricing and advertising revenue.

At the conclusion of trial, the jury found that defendants sold advertising space at a price below cost for the purpose of harming plaintiff as a competitor in violation of section 17043. A verdict was rendered in favor of plaintiff and against each of the defendants in the total amount of $15,923,521.82—that is, $6,395,636 in actual damages suffered by plaintiff, partially trebled, plus prejudgment interest. This appeal followed.

## DISCUSSION

I. *The Element of Recoupment of Losses.*

Defendants argue that a series of errors was committed by the trial court, due to the court's failure to recognize that a defendant's ability to recoup losses following below-cost pricing is an essential element of proof of a

---

[7] The reason, suggested Johnson, is that the editorial content of weekly newspapers is quite different and more localized than the daily papers, and advertisers "have no other place" to go, including the Internet, to reach the audience of the alternative weeklies.

[8] The Pacific Sun was purchased by Johnson in 2004, and became profitable by 2007.

violation of section 17043. Referring to "parallel federal and state predatory pricing laws," defendants maintain that an "objectively reasonable probability of recouping" losses "through later monopoly pricing" must be established by the plaintiff in a section 17043 action. The trial court denied defendants' motion for summary judgment, partially excluded proffered defense evidence on recoupment, denied motions for directed verdict, refused to give a recoupment instruction proposed by the defense, gave the plaintiff's instruction that no proof the "defendant would have had a reasonable expectation of recouping its losses by eliminating the plaintiff as a competitor" was necessary,[9] and finally denied a motion for judgment notwithstanding the verdict, all predicated upon a faulty determination that California law does not require proof of recoupment ability. Defendants claim that in its rulings the court "failed to assess whether recoupment ability existed and compounded that error by instructing that the jury was not required to find that defendants' conduct was economically rational *or* that defendants would likely be able to recoup losses from below-cost sales." They also point out that without any "proof of recoupment ability" presented by plaintiff, we must "reverse and direct judgment for defendants."

The issue of recoupment ability as an element of an action for below-cost pricing under the Unfair Practices Act (§ 17000 et seq.)[10] has not yet been resolved, and requires that we undertake an interpretation of section 17043. "In interpreting this statute, our goal is to determine the intent of the Legislature and thereby effectuate the purpose of the law. [Citation.] To do so, we apply certain fundamental rules of statutory interpretation. ' "Our first step [in determining the Legislature's intent] is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citations.]" ' [Citations.]" (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 683 [38 Cal.Rptr.3d 36].) We reject an interpretation that would render

---

[9] Defendants' proposed instruction No. 35 refused by the court was: "In order to recover, plaintiff must show that defendants had the motive to sell advertising below cost for the purpose and desire of injuring competitors or destroying competition, and also that they had the purpose and ability to recover any of their own lost profits after they have driven the plaintiff out of the market." In full, plaintiff's instruction given by the court was: "Plaintiff need not prove that it was economically rational for any defendant to act with the purpose of injuring competitors or destroying competition, or that a defendant would have had a reasonable expectation of recouping its losses by eliminating the plaintiff as a competitor. However, such evidence may be considered to the extent that it is relevant to a defendant's purpose."

[10] For convenience, we will refer to the Unfair Practices Act as the UPA, to distinguish it from related but separate statutory schemes, which have been referred to as the unfair competition law and the Unfair Business Practices Act (§§ 17200 et seq., 17500 et seq.). (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 168–169 [83 Cal.Rptr.2d 548, 973 P.2d 527]; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1258 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Klein v. Earth Elements, Inc.* (1997) 59 Cal.App.4th 965, 968 [69 Cal.Rptr.2d 623].)

particular terms mere surplusage, and instead seek to give significance to every word. (*City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 55 [19 Cal.Rptr.2d 73, 850 P.2d 621].) "When the language of a statute is clear, we need go no further. However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 [14 Cal.Rptr.3d 857, 92 P.3d 350].)

We commence our examination of section 17043 by observing the obvious: the language of the statute does not expressly mention recoupment in any way. Section 17043 provides: "It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition." Under section 17071, "proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition." Recoupment is nowhere referred to in the governing statutes.

■ Established law has also not specified that ability to recoup losses is an element of the statutory prohibition. To prove a violation of section 17043, the cases have declared that a plaintiff must allege and prove two elements: (1) below-cost sales undertaken for the purpose of injuring competitors or destroying competition that (2) have resulted in a competitive injury. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra*, 20 Cal.4th 163, 175; *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 330 [7 Cal.Rptr.3d 628]; *Turnbull & Turnbull v. ARA Transportation, Inc.* (1990) 219 Cal.App.3d 811, 819–820 [268 Cal.Rptr. 856].)

■ Thus, as defendants recognize, recoupment as an element of the statutory cause of action must be added to section 17043 "by necessary implication from its consumer-welfare purpose." We do not lightly imply terms or requirements that have not been expressly included in a statute. (*People v. Gardeley* (1996) 14 Cal.4th 605, 622 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America* (2005) 133 Cal.App.4th 1319, 1340 [35 Cal.Rptr.3d 496].) " '[A]n intention to legislate by implication is not to be presumed.' [Citation.]" (*Citizens for Better Streets v. Board of Supervisors* (2004) 117 Cal.App.4th 1, 6 [11 Cal.Rptr.3d 349].) The courts are not authorized to insert provisions or rewrite a statute to conform to an assumed

intention which does not appear from its language. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 573 [71 Cal.Rptr.2d 731, 950 P.2d 1086]; *Lewco Iron Metals, Inc. v. Superior Court* (1999) 76 Cal.App.4th 837, 843 [90 Cal.Rptr.2d 671].)

Defendants' argument for an implied recoupment provision rests on federal laws, particularly the Robinson-Patman Act (15 U.S.C. §§ 13, 21) and section 2 of the Sherman Act (15 U.S.C. § 2), along with predatory pricing laws enacted by other states. We have no dispute with the first part of defendants' premise that in predatory pricing actions pursued under federal law and some state laws, two prerequisites to recovery must be proved by the plaintiff: first, a rival's low prices are below an appropriate measure of its rival's costs; and second, defendant had a reasonable prospect or dangerous probability of recouping its investment in below-cost prices. (*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.* (1993) 509 U.S. 209, 222, 224 [125 L.Ed.2d 168, 113 S.Ct. 2578]; *Vollrath Co. v. Sammi Corp.* (9th Cir. 1993) 9 F.3d 1455, 1463.) The United States Supreme Court has declared: " 'For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered.' [Citation.] Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced. Although unsuccessful predatory pricing may encourage some inefficient substitution toward the product being sold at less than its cost, unsuccessful predation is in general a boon to consumers. [¶] . . . [¶] For recoupment to occur, below-cost pricing must be capable, as a threshold matter, of producing the intended effects on the firm's rivals, whether driving them from the market, or . . . causing them to raise their prices to supracompetitive levels within a disciplined oligopoly." (*Brooke Group Ltd., supra*, at pp. 224–225.)

Where we find fault with defendants' argument is in the assertion that section 17043 is entirely analogous to the federal and sister-state predatory pricing laws, and must therefore be interpreted correspondingly. Section 17043 recites distinctive language, and has dissimilar elements and a different focus than defendants' proffered statutory counterparts. The predatory pricing statutes referred to by defendants may all prohibit discriminatory or below-cost pricing, but the federal and other state predatory pricing laws, unlike section 17043, do not include an intent requirement. (*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.* (7th Cir. 1989) 881 F.2d 1396, 1401–1402.) The federal law instead looks to the ultimate monopolistic impact and threatened harm produced by the pricing scheme—that is, the probability of recoupment

through future supracompetitive pricing upon elimination of competitors.[11] (See *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., supra*, 509 U.S. 209, 224–225; *Cargill, Inc. v. Monfort of Colorado, Inc.* (1986) 479 U.S. 104, 117–118 [93 L.Ed.2d 427, 107 S.Ct. 484]; *Matsushita Elec. Industrial Co. v. Zenith Radio* (1986) 475 U.S. 574 [89 L.Ed.2d 538, 106 S.Ct. 1348]; *A.A. Poultry Farms, Inc., supra*, at pp. 1400–1402; *Indiana Grocery, Inc. v. Super Valu Stores, Inc.* (7th Cir. 1989) 864 F.2d 1409.) Even if business competitors engage in predatory pricing with the utmost malice directed at each other, the federal law is unconcerned unless predatory losses may be recouped and competition is thereby impaired. As the Supreme Court has observed concerning the *federal law* on predatory pricing, "Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, '[t]he predator must make a substantial investment with no assurance that it will pay off.' [Citation.] For this reason, there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful." (*Matsushita Elec., supra*, at p. 589.)

■ In section 17043, in contrast, the very gravamen of the offense is the purpose underlying the anticompetitive act, rather than the actual or threatened harm to competition. The intent or purpose of the below-cost sale is at the heart of the statute, and distinguishes the violation from a below-cost pricing strategy undertaken for legitimate, nonpredatory business reasons. (*Food & Grocery Bureau of So. California v. U.S.* (9th Cir. 1943) 139 F.2d 973, 974.) Section 17043 "does not make all sales below average total cost illegal *per se*. Instead, such sales must have been made 'for the purpose of injuring competitors or destroying competition.' [Citations.]" (*William Inglis, etc. v. ITT Continental Baking Co.* (9th Cir. 1981) 668 F.2d 1014, 1049; see also *Food & Grocery Bureau, Inc., supra*, at pp. 974–975.) The intent requirement imposed by section 17043 is an especially stringent one. "Section 17043 uses the word 'purpose,' not 'intent,' not 'knowledge.' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra*, 20 Cal.4th 163, 174.) Therefore, the California Supreme Court has concluded "that to violate section 17043, a company must act with the purpose, i.e., the desire, of injuring competitors or destroying competition." (*Id.* at pp. 174–175; see also *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 323 [70 Cal.Rptr. 849, 444 P.2d 481]; *Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra*, 114 Cal.App.4th 309, 330.)

■ Further, section 17043 does not require an anticompetitive impact. "[A]n injurious effect is not an essential element of the violation. The

---

[11] For instance, section 13(a) of the Robinson-Patman Act forbids price discrimination "where *the effect* of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce . . . ." (15 U.S.C. § 13(a), italics added.)

violation is complete when sales below cost are made with the requisite intent and not within any of the exceptions." (*People v. Pay Less Drug Store* (1944) 25 Cal.2d 108, 113–114 [153 P.2d 9].) The language of sections 17043 and 17071 makes "it sufficiently clear that the Legislature deemed that injury to a competitor or destruction of competition was an 'injurious effect,' and therefore within the ban of the act; and that it was not necessary to await success in the monopolistic effort before the measures provided to safeguard the public interest and welfare could be invoked." (*Pay Less Drug, supra,* at p. 113.) While evidence of an injury due to a below-cost pricing scheme may establish the rebuttable statutory inference of unlawful purpose, the plaintiff may also prove purpose independently without any injurious effect.

▮ Even the objectives of the laws, though certainly similar, are not identical. The Sherman Act and Robinson-Patman Act (15 U.S.C. § 13(a)) seek to prevent anticompetitive acts that impair competition or harm competitors, whereas the UPA reflects a broader "[l]egislative concern not only with the maintenance of competition, but with the maintenance of *fair and honest* competition.' [Citations.]" (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1262 [61 Cal.Rptr.2d 112, 931 P.2d 290].) We disagree with defendants' characterization of the UPA as legislation that was merely "intended to protect the public, not individual competitors." The UPA has been described by our high court "as a legislative attempt 'to regulate business as a whole by prohibiting practices which the legislature has determined constitute unfair trade practices.' (*Wholesale T. Dealers* v. *National etc. Co.* (1938) 11 Cal.2d 634, 643 [82 P.2d 3, 118 A.L.R. 486]; see also *Max Factor & Co.* v. *Kunsman* (1936) 5 Cal.2d 446, 478 [55 P.2d 177] (dis. opn. of Shenk, J.) [UPA 'appears to be a painstaking endeavor by the legislature to combat the abuses which the business interests have deemed unfair practices in the competitive field.'].)" (*ABC Internat. Traders, Inc.,* at p. 1256.) The history of the amalgamation of statutes that comprise the UPA "teaches that a primary concern in the enactment of the UPA was the protection of smaller, independent retailers, especially grocers, against unfair competitive practices of the large chain stores. As a contemporary commentator explained, the prohibitions added in 1933 on secret rebates and unearned discounts (now section 17045) and below-cost sales (now section 17043) 'are designed to protect the retailer whose more powerful neighbor is attempting to drive him out of business.' [Citations.]" (*ABC Internat., supra,* at p. 1261; see also *Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra,* 114 Cal.App.4th 309, 322.) The defendant's ability to recoup losses is unnecessary to the dual objectives of preventing unfair trade practices and protecting comparatively smaller enterprises from predatory pricing schemes of larger competitors.

Thus, California and federal cases have recognized that the UPA in many respects does not mirror federal predatory pricing law. (*William Inglis, etc. v.*

*ITT Continental Baking Co., supra,* 668 F.2d 1014, 1049; *Kirk-Mayer, Inc. v. Pac Ord, Inc.* (C.D.Cal. 1986) 626 F.Supp. 1168, 1173; *Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra,* 114 Cal.App.4th 309, 325.)[12] Defendant's reliance on federal law "fails to acknowledge the significant differences between the language of the Sherman Act, the federal antitrust statute prohibiting predatory below-cost pricing, and its state counterpart, section 17043 of the UPA." *(Fisherman's Wharf Bay Cruise Corp., supra,* at p. 325.) "It has been observed that '[t]he UPA, in contrast to the federal antitrust statutes, is precisely drawn to eliminate defined commercial practices such as predatory pricing. Therefore, changing judicial perspectives on antitrust enforcement have far less influence on the development of California predatory pricing law than on the development of the federal counterparts.' (McCall, *Private Enforcement of Predatory Price Laws Under the California Unlawful Practices Act and the Federal Antitrust Acts* (1997) 28 Pacific L.J. 311, 315 . . . .)" *(Id.* at p. 326.)

Additional features of the statutory construct of the UPA further persuade us that implication of recoupment ability as a requirement in section 17043 is neither necessary nor intended. Within other unfair trade provisions of the UPA that prohibit loss leaders (§§ 17030, 17044) and secret discriminatory rebates or allowances (§ 17045), the Legislature has seen fit in the language of the statutes to refer to potential injury to a competitor or the competitive structure, while statutes that prohibit locality price discrimination (§§ 17040–17042), like section 17043, are directed at the intent of the violation.[13] The Legislature has thus evinced the ability in the UPA to target either the purpose or ultimate effect of the violation, and clearly intended the former in the language of section 17043. We also point out that exceptions or defenses to the scope of the prohibition against below-cost sales, such as

---

[12] In contrast, the federal anticompetition philosophies of the Sherman and Robinson-Patman Acts are often valuable in discussing the provisions of the California Cartwright Act (§ 16700 et seq.). (See *SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 90 [76 Cal.Rptr.3d 73].)

[13] For instance, section 17030 defines a "loss leader" as any article or product sold at less than cost: "(a) Where the purpose is to induce, promote or encourage the purchase of other merchandise; or [¶] (b) Where the *effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers*; or [¶] (c) Where the *effect is to divert trade from or otherwise injure competitors.*" (Italics added.) Section 17045 provides: "The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, *to the injury of a competitor* and where such payment or allowance tends to destroy competition, is unlawful." (Italics added.) However, section 17040, more in line with section 17043, prohibits locality discrimination in the "production, manufacture, distribution or sale of any article or product of general use or consumption, *with intent to destroy the competition of any regular established dealer in such article or product, or to prevent the competition* of any person who in good faith, intends and attempts to become such dealer, to create locality discriminations." (Italics added.)

sales to meet competition, sales of damaged goods, or sales to close out stock, have been conspicuously delineated by the Legislature in section 17050; inability to recoup predatory losses is not among them.

Finally, we are not convinced by defendants' argument that the "severe consequences" of violation of section 17043—which may include fines, treble damages, and even potential criminal sanctions—make the statute "draconian" without an implied recoupment requirement. The rigorous task imposed upon the plaintiff in a section 17043 action to prove "that the below-cost sales were done 'for the purpose of injuring competitors or destroying competition' " makes proof of a statutory violation "formidable" enough to justify the associated penalties. (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra*, 114 Cal.App.4th 309, 330.)

■ In light of the distinctions we discern, some glaring, some subtle, between section 17043 and the federal or other state predatory pricing laws,[14] and particularly in light of the conspicuous focus of section 17043 upon the mental state of defendants' purpose rather than ultimate impact of below-cost pricing, we decline to imply a recoupment element in the statute where none has been expressed. We therefore conclude that the trial court, in its rulings on motions, the presentation of evidence, and instructions, did not err by refusing to recognize defendants' recoupment claim.[15]

## II. *The Instructions on Purpose to Harm a Competitor.*

We turn to defendants' challenge to the instructions and accompanying verdict form on the "purpose requirement" of section 17043. Defendants claim the "instructions and verdict form erroneously permitted the jury to base liability on an intent to harm a *single competitor*," rather than "the UPA term 'competitors.' " (Italics added.) Two instructions are at issue. In the first, the court explained the statutory presumption by stating that if the jury found "any below-cost sales injured the Bay Guardian as a *competitor*, it is presumed that defendants' purpose was to injure competitors and destroy competition." In the second, the court advised the jury that a "defendant does

---

[14] We have reviewed the statutes and cases cited by defendant from other states, and find in them language and objectives that are distinguishable from section 17043. (See generally McCarthy, *Whatever Happened to the Small Businessman? The California Unfair Practices Act* (1968) 2 U.S.F. L.Rev. 165, 196–197; McCall, *Private Enforcement of Predatory Price Laws Under the California Unlawful Practices Act and the Federal Antitrust Acts* (1997) 28 Pac. L.J. 311, 338–339.)

[15] The instruction to the jury that specified what the plaintiff did *not need to prove*—that it was economically rational for any defendant to act with the purpose of injuring competitors or destroying competition, or that a defendant would have had a reasonable expectation of recouping its losses by eliminating the plaintiff as a competitor may have been unnecessary, but we find that it was not prejudicial error.

not act with the required 'purpose' under the statute merely because it had knowledge of probable substantial harm to a *competitor* or that customers would be diverted from a *competitor*." (Italics added.) The verdict form asked the jury to determine if defendants' purpose was to "injure a *competitor* or destroy competition." Defendants maintain that the effect of the instructions and verdict form was to direct the jury to "impose liability merely by finding defendants made below-cost sales with a subjective intent to harm [the Guardian] *alone*," in contradistinction to the statutory language which prohibits below-cost pricing "for the purpose of injuring competitors or [destroying] competition." (Italics added.) Defendants' position is that the jury "should have evaluated whether defendants' purpose was to inflict market-wide injury."

■ Defendants' proposed interpretation of section 17043 is at odds with both common sense and the objectives of the statute. Defendants would have us interpret the law to prohibit below-cost pricing only if multiple competitors are the target of an unlawful marketing scheme. As we have observed, the "declared purposes of the UPA are 'to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented.' (§ 17001.)" (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp.*, supra, 14 Cal.4th 1247, 1256.) The Legislature has also "specifically directed that the UPA's provisions 'shall be liberally construed that its beneficial purposes may be subserved.' (§ 17002.)" (*Ibid.*; see also *Co-Opportunities v. National Broadcasting Co.* (N.D.Cal. 1981) 510 F.Supp. 43, 49–50.) ■ Thus, section 17043, like the remainder of the UPA, seeks to maintain fair and honest competition to protect smaller, independent retailers from the predatory practices of larger, more controlling competitors. (*ABC, supra*, at p. 1262.) The prohibitions against below-cost sales " ' "are designed to protect . . . [*a competitor*] whose more powerful neighbor is attempting to drive him out of business." [Citations.]' " (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra*, 114 Cal.App.4th 309, 322, italics added, quoting from *ABC Internat. Traders, Inc. v. Matsushita Electric Corp., supra*, at p. 1261.) "[I]njury to a *competitor* or destruction of competition" is considered an " 'injurious effect,' and therefore within the ban of the UPA. (*People v. Pay Less Drug Store, supra*, 25 Cal.2d 108, 113, italics added.) In short, section 17043 is designed to reach a one-on-one clash between competitors, not just an effect on competition.

■ A literal reading of section 17043 to require at least one economic actor in the field in addition to the defendant, so as to injure multiple competitors, would deprive the statute of much of its utility in at least two practical situations. If a given plaintiff and defendant are the only providers of an article or product, any head-to-head competition between them would

be beyond the reach of section 17043 because neither is "injuring competitors." Indeed, head-to-head competition was the legal focus of the section 17043 claim in *Fisherman's Wharf Bay Cruise Corp.* (The plaintiff was the Red & White Fleet, and defendant was Blue & Gold Fleet.) Moreover, defendants' suggested interpretation of the law would immunize a business which serially engages in below-cost pricing to eliminate competitors one at a time, thereby permitting the very unlawful practices the statute seeks to proscribe. We are guided by maxims of statutory interpretation, which direct us to avoid such illogical and meaningless consequences. (*People v. Navarro* (2007) 40 Cal.4th 668, 680 [54 Cal.Rptr.3d 766, 151 P.3d 1177].) " ' "If possible, the words should be interpreted to make them workable and reasonable [citations], . . . practical [citations], in accord with common sense and justice, and to avoid an absurd result [citations]." [Citation.]' [Citation.]" (*Cummings v. Stanley* (2009) 177 Cal.App.4th 493, 508 [99 Cal.Rptr.3d 284].) ▮ Giving the statute an interpretation that reaches only plural rather than single competitors also conflicts with the more general directive of the Business and Professions Code that words used in the singular or plural refer to both. (§ 23008;[16] see also *People v. Manfredi* (2008) 169 Cal.App.4th 622, 631 [86 Cal.Rptr.3d 810]; *Cheek v. Superior Court* (2002) 103 Cal.App.4th 520, 525 [126 Cal.Rptr.2d 820]; *San Gabriel Valley Water Co. v. Hartford Accident & Indemnity Co.* (2000) 82 Cal.App.4th 1230, 1240 [98 Cal.Rptr.2d 807].) ▮ We find that section 17043 applies to acts of below-cost pricing committed for the purpose of injuring either a single or multiple competitors or destroying competition. Therefore, the reference to a single competitor in the instructions and verdict form was not incorrect in the present case, particularly inasmuch as only a single competitor was the focus of the predatory pricing scheme.

## III. *The Instructions on the Statutory Presumption.*

We move to defendants' contention that the instructions on the statutory presumption of improper purpose (§ 17071) were defective. The court instructed the jury on the essential element of purpose by stating: "It is only when a defendant sells advertising below cost and does so with the purpose, that is, desire of injuring competitors or destroying competition, that such conduct is unlawful under California law." The court also advised the jury that, "Purpose may be inferred from circumstantial evidence of a party's conduct or course of dealing, and may be proved the same way as any other fact may be proved either by direct or circumstantial evidence or by both direct and circumstantial evidence." In addition, pursuant to section 17071 the court gave the following instruction on the presumption of unlawful purpose:

[16] Section 23008 reads: " 'Person' includes any individual, firm, copartnership, joint adventure, association, corporation, estate, trust, business trust, receiver, syndicate, or any other group or combination acting as a unit, and the plural as well as the singular number."

"If you find that any defendant sold advertising space below cost, and any below-cost sales injured the Bay Guardian as a competitor, it is presumed that defendants' purpose was to injure competitors and destroy competition. But this presumption may be overcome by other evidence." The court then proceeded to describe the nature of evidence that did not prove unlawful purpose. Defendants complain that the presumption instruction was "incorrect for two reasons" and thus should not have been given: first, once some rebuttal evidence was adduced that defendants "did not act with an anti-competitive purpose," the presumption was rendered inoperative and the instruction became irrelevant; and second, the instruction "improperly shifted *plaintiff's* burden to *prove* purpose to *defendants* to *disprove* it."

"In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585 [102 Cal.Rptr.2d 254].) "A court is required to instruct on the law applicable to the case, but no particular form is required; the instructions must be complete and a correct statement of the law. [Citation.] The meaning of instructions is tested by 'whether there is a "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel.' [Citation.] ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citation.]' [Citation.] Thus, absence of an essential element in a given instruction may be supplied by reference to another instruction, or cured in light of the instructions considered as a whole." (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370–371 [81 Cal.Rptr.3d 32].)

██ Dealing first with the claim that the presumption was no longer operative once defense presented evidence "sufficient to support a finding of the nonexistence of the presumption," defendants do not dispute the presentation of adequate foundational evidence by plaintiff to trigger the initial presumption. Instead they claim that the presumption was effectively rebutted by their "denial of anticompetitive purpose," which was "sufficient evidence to take section 17071's presumption out-of-play [*sic*]." The propriety of the presumption instruction in the present case depends upon whether the section 17071 presumption of purpose is viewed as one affecting the burden of proof or the burden of presenting evidence. The distinction has an important consequence when conflicting evidence is presented. "A rebuttable presumption may affect the burden of proof or may affect the burden of producing evidence. (Evid. Code, § 601.)" (*In re Heather B.* (1992) 9 Cal.App.4th 535,

560 [11 Cal.Rptr.2d 891].) "A presumption affecting the burden of producing evidence requires the ultimate fact to be found from proof of the predicate facts in the absence of other evidence. If contrary evidence is introduced then the presumption has no further effect and the matter must be determined on the evidence presented. (Evid. Code, § 604.)" (*Id.* at p. 561.)

In contrast, a " 'presumption affecting the burden of proof has a more substantial impact in determining the outcome of litigation. The effect of a presumption affecting the burden of proof is "to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.) . . .' [Citation.]" (*Gee v. Workers' Comp. Appeals Bd.* (2002) 96 Cal.App.4th 1418, 1425 [118 Cal.Rptr.2d 105]; see also *Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th 1067, 1085 [29 Cal.Rptr.2d 693].) "[O]nce a presumption affecting the burden of proof comes into play, that is an issue which must be presented to the *trier of fact.*" (*Haycock v. Hughes Aircraft Co.* (1994) 22 Cal.App.4th 1473, 1495 [28 Cal.Rptr.2d 248].) "If contrary evidence is introduced the jury has the right to weigh the evidence and determine whether it sufficiently contradicts the presumption." (*Noble v. Key System, Ltd.* (1935) 10 Cal.App.2d 132, 138 [51 P.2d 887].) A presumption affecting the burden of proof "survives even though there is a conflict in the evidence," so "in the face of conflicting evidence, the issue must be presented to the jury so long as there is some logical basis for the presumption." (*Haycock, supra,* at p. 1491.)

We thus examine the nature and result of the presumption. "Under section 17071, 'proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition.' " (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra,* 114 Cal.App.4th 309, 321.) "To create this presumption proof must be had, among other things, of one or more sales of an article or product below cost together with proof of the injurious effect of the practice." (*Dooley's Hardware Mart v. Food Giant Markets, Inc.* (1971) 21 Cal.App.3d 513, 517 [98 Cal.Rptr. 543].) "Injurious effect" is not explicitly defined in the statute, but has been interpreted to mean "injury to a competitor or destruction of competition," consistent with the language of section 17043. (*People v. Pay Less Drug Store, supra,* 25 Cal.2d 108, 113.)

The functionally identical presumption created by section 17071.5[17] of the UPA for loss leader sales has been found to be "a presumption affecting the

---

[17] Section 17071.5 reads: "In all actions brought under this chapter proof of limitation of the quantity of any article or product sold or offered for sale to any one customer to a quantity less than the entire supply thereof owned or possessed by the seller or which he is otherwise authorized to sell at the place of such sale or offering for sale, together with proof that the price at which the article or product is so sold or offered for sale is in fact below its invoice or

*burden of proof*," rather than the burden of producing evidence—that is, if the presumption arises defendants are required to prove "they did not intend to injure competitors or destroy competition" through their use of predatory pricing. (*Dooley's Hardware Mart v. Food Giant Markets, Inc., supra*, 21 Cal.App.3d 513, 517–518, italics added.)

 Like section 17071.5, we conclude that the section 17071 presumption is properly categorized as one that affects the burden of proof rather than merely the burden of persuasion. (See *Dooley's Hardware Mart v. Food Giant Markets, Inc., supra*, 21 Cal.App.3d 513, 517–518.) "A presumption affecting the burden of proof shifts the burden of persuasion on an ultimate fact to the party against whom the presumption operates upon a finding of the predicate facts. (Evid. Code, § 606.)" (*In re Heather B., supra*, 9 Cal.App.4th 535, 560.) "A presumption meant to establish or implement some public policy other than facilitation of the particular action in which it applies is a presumption affecting the burden of proof." (*People v. Dubon* (2001) 90 Cal.App.4th 944, 953 [108 Cal.Rptr.2d 914]; see also Evid. Code, § 605; *Reeves v. Workers' Comp. Appeals Bd.* (2000) 80 Cal.App.4th 22, 30 [95 Cal.Rptr.2d 74].) As we view section 17071, the presumption is indicative of an effort by the Legislature to implement the public policy of facilitating proof of unlawful purpose of below-cost sales that injure a competitor by shifting the burden of proof to the party more in possession of relevant evidence demonstrating the true intent associated with the pricing scheme. (*People v. Pay Less Drug Store, supra*, 25 Cal.2d 108, 114–115.) Thus, the presumption is intended to affect the burden of proof. (*Gee v. Workers' Comp. Appeals Bd., supra*, 96 Cal.App.4th 1418, 1426.)

 Further, the stated consequence of the articulated presumption demonstrates that it modifies the burden of proof. "[T]he obvious and only effect of the presumption created by section 17071" is to require the defendant "to go forward *with proof* to negate the presumption of wrongful intent." (*Western Union Financial Services, Inc. v. First Data Corp.* (1993) 20 Cal.App.4th 1530, 1540 [25 Cal.Rptr.2d 341], italics added.) "[T]he allocation of evidentiary burdens [under section 17071 is] as follows: 'Assuming proof of injury to a competitor has been made, California law allows plaintiffs to establish a prima facie case with proof of prices below average total cost. The defendant then has the burden of negating the inference of illegal intent or establishing an affirmative defense.' . . . [Citation.]" (*Turnbull & Turnbull v. ARA*

---

replacement cost, whichever is lower, raises a presumption of the purpose or intent to injure competitors or destroy competition. This section applies only to sales by persons conducting a retail business the principal part of which involves the resale to consumers of commodities purchased or acquired for that purpose, as distinguished from persons principally engaged in the sale to consumers of commodities of their own production or manufacture."

*Transportation, Inc., supra,* 219 Cal.App.3d 811, 824–825.) The presumption "may be rebutted by establishing one of the statute's affirmative defenses, such as meeting competition, *see* Cal.Bus. & Prof.Code § 17050, or by showing that the sales 'were made in good faith and not for the purpose of injuring competitors or destroying competition.' [Citation.]" (*William Inglis, etc. v. ITT Continental Baking Co., supra,* 668 F.2d 1014, 1049; see also *Dooley's Hardware Mart v. Food Giant Markets, Inc., supra,* 21 Cal.App.3d 513, 518.) "After proof of the sales below cost and injury resulting therefrom, there is no undue hardship cast upon the defendants to require them to come forward with evidence of their true intent as against the prima facie showing, or with evidence which will bring them within a specified exception in the act." (*People v. Pay Less Drug Store, supra,* 25 Cal.2d 108, 115.) Once the presumption is rebutted, "the burden shifts back to the moving party to offer actual proof of injurious intent." (*Western Union Financial Services, Inc. v. First Data Corp., supra,* at p. 1540.)

The section 17071 presumption, being one that in both nature and consequence alters the burden of proof, did " '*not* disappear in the face of evidence as to the *nonexistence* of the presumed fact. . . .' [Citations.]" (*Haycock v. Hughes Aircraft Co., supra,* 22 Cal.App.4th 1473, 1495.) Therefore, the fact that defendants denied any purpose to harm competition, and produced some evidence of good faith efforts to compete in the marketplace, did not negate plaintiff's right to an instruction on a presumption affecting the burden of proof of unlawful purpose. Defendants may have offered rebuttal evidence, but they did not negate the presumption by conclusive proof that negated unlawful purpose as a matter of law or compelled a finding on the issue in their favor based on this record. (See *Xebec Development Partners, Ltd. v. National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501, 552 [15 Cal.Rptr.2d 726], disapproved on other grounds in *Essex Ins. Co. v. Five Star Dye House, Inc.* (2006) 38 Cal.4th 1252, 1265, fn. 4 [45 Cal.Rptr.3d 362, 137 P.3d 192].)

Despite the defense efforts to rebut the section 17071 presumption, at least substantial evidence in support of the presumption instruction remained. "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298]; see also *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1107–1108 [16 Cal.Rptr.3d 521].) Substantial evidence necessary to support a jury instruction is " 'evidence sufficient to deserve consideration by the jury, i.e., evidence from which a

jury composed of reasonable [persons] could have concluded that the particular facts underlying the instruction did exist. . . .' [Citation.]" (*People v. Strozier* (1993) 20 Cal.App.4th 55, 63 [24 Cal.Rptr.2d 362]; see also *People v. Marshall* (1997) 15 Cal.4th 1, 39–40 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 429 [72 Cal.Rptr.2d 720].) "Evidence is substantial if a reasonable jury could find it persuasive [citation] and therefore conclude ' " 'that the particular facts underlying the instruction did exist' " ' [citation]." (*People v. Elam* (2001) 91 Cal.App.4th 298, 308 [110 Cal.Rptr.2d 185].) Substantial evidence to support the presumption was presented, and the contradictory rebuttal evidence offered by defendants did not irrefutably disprove purpose. Plaintiff was therefore entitled to the benefit of an instruction on the section 17071 presumption, just as defendants were entitled to an instruction that the presumption was subject to rebuttal. (*Lara v. Nevitt* (2004) 123 Cal.App.4th 454, 460 [19 Cal.Rptr.3d 865]; *Haycock v. Hughes Aircraft Co., supra*, 22 Cal.App.4th 1473, 1492, 1495.)

Turning to the second prong of defendants' challenge to the presumption instruction, we find nothing in the instruction that erroneously shifted the burden of proof. The trial court gave a definitive standard instruction that plaintiff bore the burden to prove by a preponderance of the evidence all of the elements of the case, and specifically "that the defendant's purpose was to injure competitors or destroy competition." Thus, the jury knew that plaintiff retained the essential burden to prove the unlawful purpose of the sales. The court then advised the jury that unlawful purpose "may be proved the same way as any other fact," by direct or circumstantial evidence. The presumption was explained with an instruction that *if* the jury found "below-cost sales injured the Bay Guardian as a competitor, it is presumed that defendants' purpose was to injure competitors and destroy competition." The rebuttal part of the instruction stated, "But this presumption may be overcome by other evidence."

■ The section 17071 instruction thus merely stated a rebuttable permissive presumption or inference, which allowed, but did not compel, the trier of fact to infer the elemental fact from proof by plaintiff of other foundational facts. (See *People v. Parson* (2008) 44 Cal.4th 332, 355–356 [79 Cal.Rptr.3d 269, 187 P.3d 1]; *People v. McCall* (2004) 32 Cal.4th 175, 182–183 [8 Cal.Rptr.3d 337, 82 P.3d 351].) The instruction did not create a mandatory presumption that operated to shift plaintiff's burden of proof to the defense, as the jury was not required to draw the described inference. (*People v. Parson, supra*, at p. 356; *People v. McCall, supra*, at p. 183, fn. 5; *People v. Yeoman* (2003) 31 Cal.4th 93, 131 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) Further, nothing in the instruction directly or indirectly relieved plaintiff of its

burden to establish proof of unlawful purpose. (*People v. Prieto* (2003) 30 Cal.4th 226, 248 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) "The most common evidentiary device is the entirely permissive inference or presumption," which "leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof" to the defense. (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 157 [60 L.Ed.2d 777, 99 S.Ct. 2213].) In any event, given the court's other instructions regarding the burden of proof and proper consideration and weighing of evidence, the presumption instruction did not shift or reduce plaintiff's burden of proof in this case. (*People v. Parson, supra,* at p. 356; *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 84 [89 Cal.Rptr.3d 34]; *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1673–1674 [3 Cal.Rptr.3d 279]; *People v. Gonzalez* (1995) 33 Cal.App.4th 1440, 1443 [39 Cal.Rptr.2d 778]; *People v. Carter* (1993) 19 Cal.App.4th 1236, 1252–1253 [23 Cal.Rptr.2d 888].) Furthermore, our duty is to look at the instructions as a whole, not in isolation, and we must assume jurors are able to correlate, follow, and understand the court's instructions. (*People v. Vang* (2009) 171 Cal.App.4th 1120, 1129 [90 Cal.Rptr.3d 328]; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1192–1193 [67 Cal.Rptr.3d 871].) We conclude that no shift in the burden of proof occurred with the presumption instruction, as the jury was aware from the totality of the instructions that a verdict could not be rendered in favor of plaintiff unless a finding was made based on a preponderance of the evidence that defendants did in fact make below-cost sales with the requisite purpose.

The minor flaw we perceive in the instruction, when it is viewed in isolation, is that it was somewhat incomplete. In addition to the admonition that the presumption "may be overcome by other evidence," the instruction should have more specifically advised the jury that the presumption was rebutted with proof by defendants of the nonexistence of the presumed fact of unlawful purpose by a preponderance of the evidence. (See *Shadow Traffic Network v. Superior Court, supra,* 24 Cal.App.4th 1067, 1085; *Haycock v. Hughes Aircraft Co., supra,* 22 Cal.App.4th 1473, 1495.) When we again view the instructions in their entirety, however, we find no prejudicial error. The additional instructions thoroughly defined for the jury the evidence that negated proof of purpose.

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 438.

## DISPOSITION

Accordingly, the judgment against defendant East Bay Express is reversed. In all other respects the judgment is affirmed.

Respondent to recover costs on appeal.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied September 8, 2010, and on August 11, 2010, and September 8, 2010, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied November 23, 2010, S186497. Kennard, J., was of the opinion that the petition should be granted.